T.C. Memo. 1998-454


UNITED STATES TAX COURT


ESTATE OF EDWARD BROCKENBROUGH, DECEASED,
SHARON BROCKENBROUGH, AND SUNTRUST BANK, COEXECUTORS,
AND SHARON BROCKENBROUGH, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 22596-95.                  Filed December 28, 1998.


<u>Vivian D. Hoard</u>, <u>David D. Aughtry</u>, and <u>Donald P. Lancaster</u>, for petitioners.

<u>Clinton M. Fried</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


COLVIN, <u>Judge</u>:  Respondent determined deficiencies in petitioners' 1991 and 1992 Federal income tax and an accuracy-related penalty as follows:

|  |  | Sec. 6662 |
| Year | Deficiency | Penalty |
| 1991 | $11,611 | $2,322.20 |
| 1992 | 16,818 | 3,363.60 |

Petitioners owned an antique store during the years in issue. Petitioners also owned a 52-acre farm on which they bred and trained quarter horses and held three rodeos during the years in issue. Respondent concedes that petitioners operated the rodeos for profit. In 1992, petitioners discontinued the horse and rodeo undertakings[1] and began to operate a craft fair. After concessions, the issues for decision are:

1.  Whether petitioners operated their antique store for profit in 1991 and 1992. We hold that they did not.

2.  Whether petitioners operated the horse and rodeo undertakings as one activity in 1991 and 1992. We hold that they did.

3.  Whether petitioners operated their horse and rodeo activity for profit in 1991 and 1992. We hold that they did.

4.  Whether petitioners are liable for the accuracy-related penalty for negligence under section 6662 for 1991 and 1992. We hold that they are to the extent discussed below.

_____

[1] For purposes of sec. 183, two or more "undertakings" may be one "activity". Sec. 1.183-1(d)(1), Income Tax Regs. We refer to horse and rodeo "undertakings" because one of the issues in dispute is whether they were one activity.

Section references are to the Internal Revenue Code. Unless otherwise indicated, Rule references are to the Tax Court Rules of Practice and Procedure.

## I. FINDINGS OF FACT

### A. Petitioners

Petitioners were married and lived in Gay, Georgia, when they filed their petition.[2] In 1993, the population of Gay was about 125.

#### 1. Edward Brockenbrough

Petitioner Edward Brockenbrough (Mr. Brockenbrough) was born in 1935. His paternal and maternal grandparents operated dairies. His parents were airplane pilots. They owned about 300 acres of land on which they operated an airport and a farm with cattle, horses, and pigs. Mr. Brockenbrough milked cows every day for 7 years when he was a child. Mr. Brockenbrough took one agricultural course and was a member of the Future Farmers of America when he was in high school. He graduated from college with a degree in economics. He left home after he graduated from college.

Mr. Brockenbrough began working as a pilot for Delta Airlines (Delta) when he was 28 years old. Federal law required him to retire on August 8, 1995, when he reached the age of 60. He had worked for Delta 31 years when he retired. For the 15

---

[2] Petitioner Edward Brockenbrough died after the trial was held in this case.

years before he retired on August 8, 1995, Mr. Brockenbrough flew international routes to Europe which required him to be away from home about 12 days a month. He and his wife vacationed about 1 month each year in Florida, where they had a boat.

Mr. Brockenbrough's wages from Delta were $228,102 in 1991, $251,822 in 1992, and $47,612 in 1996, the year after he retired. Mr. Brockenbrough also received a lump sum distribution in 1995 of about $750,000.

### 2. Sharon Brockenbrough

Petitioner Sharon Brockenbrough (Mrs. Brockenbrough) was a flight attendant on Delta's flights to Europe from about 1982 to the date of trial. Around the time petitioners started their antique activity, Mrs. Brockenbrough typically left Atlanta on Friday nights and returned on Sunday nights.

### 3. Petitioners' Farm

Petitioners wanted to live in a farming area near Atlanta, Georgia, and be able to generate some income after they retired from Delta. In 1986, they bought a 52-acre farm with a house on it in Gay, Georgia, about an hour's drive south of Atlanta. They paid for the farm by assuming about a $130,000 balance on the seller's mortgage. Petitioners did not buy the farm to speculate on land values.

## B. Olde Bank Antiques

There were three or four antique stores in the Gay, Georgia, area in the mid-1980's. Mr. Brockenbrough discussed starting an

antique store with Joe Rollins (Rollins). Rollins was petitioners' certified public accountant from 1979 to 1989.

Petitioners spoke with antique dealers in the area, including Mrs. Gay, about operating an antique business. Mrs. Gay had been in the antiques and arts and crafts business in Gay all of her life and petitioners thought she had been successful.

Petitioners bought a building in the town square from Mrs. Gay for $7,000 in 1986 or 1987 to house their antique store. Mr. Brockenbrough spoke about petitioners' antique store with the banker who financed the purchase of the building. The building adjoined petitioners' farm and was across the street from the entrance to the Cotton Picking Fair, an arts and crafts fair held in Gay and attended by about 100,000 people twice a year (see par. I-D, below). The building had been a small bank in Gay. It had a teller's cage, an old cannonball safe, a glass window, and bookshelves. The building was in disrepair. Petitioners spent about $30,000 to buy and renovate the building. Petitioners expected the building to increase in value.

Petitioners opened an antique store called Olde Bank Antiques in the bank building about 1987. Mrs. Brockenbrough ran the store. She likes antiques. Mrs. Brockenbrough bought some items on her flights to Europe to sell in her antique store. Mr. Brockenbrough helped the business by framing pictures and making lamps.

Petitioners relied on friends to operate the antique store when Mrs. Brockenbrough was away. Initially, Ray Hawkins (Hawkins) operated the store when Mrs. Brockenbrough was away. Petitioners did not pay Hawkins. Later, petitioners hired Hawkins' wife to help run the business and to be a part-time bookkeeper.

Before the years in issue, petitioners advertised their antique shop in the Meriwether Indicator, the only newspaper in the county at the time.

Petitioners' antique business did not do well. An antique center opened in Warm Springs, Georgia, south of Gay, drawing customers away.

In February 1990, Gay's mayor and four city council members decided that Gay needed a city hall. Mr. Brockenbrough offered to sell them the old bank building. Petitioners had the building appraised and submitted the result to the city council. The city council did not buy the building.

By 1990 or 1991,[3] petitioners knew that they could not make a profit from their antique store. They kept it open part time (3 to 5 days a week) until they could sell their merchandise. They also left a sign in the window with their telephone number and a message that if anyone saw anything that they liked in the window to call petitioners at home, which was about 100 yards

---

[3] The years in issue in this case are 1991 and 1992.

away.  In 1992, petitioners held an auction at which they sold
all of their inventory.  At trial, petitioners did not know how
many antiques they had sold in 1991 and 1992 or what their
inventory was during those years.

Beginning in 1992, petitioners used the building as an
office for their fair (see par. I-D, below) and a place to keep
their books.  Petitioners sold the building in 1995 for $35,000.

Olde Bank Antiques had a separate checking account in 1991
and 1992.  Olde Bank Antiques never earned a profit.  On their
1991 return, petitioners reported gross receipts for Olde Bank
Antiques of $1,885, cost of goods sold of $1,802, and expenses of
$11,035.  They did not deduct any wage or advertising expenses
for Olde Bank Antiques.  On their 1992 return, petitioners
reported gross receipts for Olde Bank Antiques of $2,589, cost of
goods sold of $4,743, and expenses of $7,496.

C.  Blue Horse Farms

1.  Petitioners' Horse Breeding and Training

a.  Plans and Preparation

Mr. Brockenbrough decided to breed, raise, and train quarter
horses at petitioners' farm in Gay.  He had no experience in the
business of breeding, raising, or training horses.  Before he
bought any horses, Mr. Brockenbrough investigated the horse
breeding and training business with Earl Bumgarner (Bumgarner),
Bob Roland (Roland), Tommy Cashion (Cashion), Chuck Cole (Cole),
and Max Chase, all of whom were active in the horse business.

Bumgarner was a professional horse trainer who trained quarter horses, produced rodeos, and was on the Georgia Rodeo Board. He was also a chaplain for the Rodeo Cowboys Association of America. Roland was a quarter horse specialist. Cashion was familiar with the quarter horse, cattle, and rodeo businesses. He rode quarter horses in rodeos. At the time of trial, Cashion managed a business of raising quarter horses and cattle.

Mr. Brockenbrough thought petitioners could make a profit by selling quarter horses because quarter horses are preferred by rodeo riders and barrel racers, and they work well with cattle. However, he believed that it would be several years before petitioners could make a profit from quarter horses because of the time required to breed and train horses.

In 1991, David Jordan (Jordan), a certified public accountant, told petitioners how to keep books and records that they would need to make business decisions and that he would need to prepare their income tax returns. Jordan developed a recordkeeping system for petitioners based on their checking account. Petitioners kept detailed financial records as requested by their accountant. They had a separate checking account for their farm activity. Petitioners called their farm Blue Horse Farms. Petitioners gave all of the records relating to Blue Horse Farms to their accountant and relied on him to prepare their returns properly.

In 1991, Mr. Brockenbrough built a barn with stalls for $102,065 and a horse arena with lighting.

b.    Initial Stock

Petitioners bought 15 horses in 1991.  Petitioners bought six quarter horses (five mares and one stud named Sam Skyles) from Bobby Denton (Denton) in Colorado in February 1991.  A veterinarian checked the horses before Denton released them to petitioners.  Petitioners bred many of these mares to Sam Skyles. They also bought a mare in February 1991 from Cole.

In August 1991, petitioners bought six quarter horses (mares) from Denton.  Denton had bred those mares to Invaders Zorro, a stallion which was a paint horse (a type of quarter horse), before selling them to petitioners.  Despite this, one of those mares was not in foal.  Another mare died foaling her colt. Three mares contracted a virus from fescue grass not found in Colorado which caused them to abort.

In October 1991, petitioners bought two riding horses to train.

Petitioners joined the American Quarter Horse Association and registered their quarter horses with it.  Petitioners reported Sam Skyles' breeding activity in the American Quarter Horse Association Stallion Breeding Report.

Petitioner also bought 16 cattle in 1991 to use to train their quarter horses.

c. Hiring Bumgarner

Petitioners hired Bumgarner to manage Blue Horse Farms. Bumgarner fed the animals, helped keep the barn clean, trained the foals, showed the horses, and supervised the arena and weekend roping events. Petitioners paid Bumgarner about $400 per week plus a percentage of their income from the horses. Paying a manager that amount of salary plus a percentage of income was customary for a farm like petitioners'.

d. Operations

Petitioners began to operate their horse activity in 1991. Petitioners reported having six employees for the farm in 1991. Petitioners' employees provided services including training, boarding, shoeing horses, and giving riding lessons. Petitioners obtained insurance for their horse activity. Petitioners expected that their animals would breed and increase in number. Petitioners expected to train the foals to increase their value, and then to sell them.

John Brockenbrough, Mr. Brockenbrough's son, worked at Blue Horse Farms after he graduated from college. He overfed a mare which caused her death.

Mr. Brockenbrough was not a horse trainer, but he did a lot of the dirty work relating to the horses, such as putting up hay and cleaning the stalls. He gave the animals shots and vitamin supplements. He did not ride horses in 1991 and 1992. Mr. Brockenbrough told Bumgarner not to contact him while he was on

international flights.  Mrs. Brockenbrough does not like to ride horses.

Petitioners advertised their horse business on the radio and in magazines such as Horse Lovers, Stable Mates, and The Quarter Horse Association.

### 2.  The Rodeos

Mr. Brockenbrough wanted to publicize his horses and generate revenue for Blue Horse Farms to offset losses he expected initially.  Conducting rodeos can complement breeding quarter horses.  Quarter horses are used extensively in rodeos for calf roping, steer wrestling, team pinning, team roping, and barrel racing.

Before deciding to hold rodeos at Blue Horse Farms, Mr. Brockenbrough discussed the rodeo business and how to produce a rodeo at his farm with members of a southeastern regional rodeo association, bankers, and accountants.  He attended many rodeos, but he did not review financial data of those rodeos.

Petitioners held a total of three rodeos in 1991 and 1992. Petitioners used the advertising and programs for the rodeos to advertise their horse operations.

Petitioners contracted with Charley Lowrey of 4 L Rodeo Productions (4 L), Summerville, Georgia, to produce their first rodeo, which was held on October 5 and 6, 1991.  Petitioners provided all the advertising, advertising books, bleachers,

spectator insurance, a forklift to load and unload bucking chutes, lighting, water for livestock, sewage and water, electricity, tickets and people to handle tickets, restrooms, spectator seating, concession stands, a tractor and disk to work the arena, and an ambulance. 4 L provided animals and personnel for the events.

Petitioners hired Cotton Young (Young) to produce their second rodeo, which was held on May 1 and 2, 1992. Petitioners paid Young about $16,000. Petitioners' responsibilities were essentially the same as for the first rodeo.

Mr. Brockenbrough and Bumgarner produced petitioners' third rodeo, which was held in the fall of 1992. They produced the rodeo themselves in an attempt to minimize expenses and generate a profit. They used their horses and cattle and rented a few steers for that rodeo.

Cashion saw petitioners' stud, Sam Skyles, while he attended one of petitioners' rodeos. He decided to breed Sam Skyles to one of his mares.

Petitioners used the same accountant and checking account for their rodeo and horse undertakings.

3. <u>Bumgarner's Dismissal</u>

By the time they held the third rodeo, petitioners concluded that Bumgarner had been using petitioners' facilities, feed, and stud horses without paying petitioners, selling cattle without giving petitioners the proceeds, and using two of his uninsured

friends as riders during the third rodeo against petitioners' orders. Petitioners discharged Bumgarner shortly after the third rodeo.

### 4. Cessation of the Horse and Rodeo Undertakings

Petitioners could not find anyone to replace Bumgarner, and they were losing money on their horses and rodeos. They decided to discontinue these undertakings. They sold their animals for $8,413.20.

### D. Great Gay, Georgia, Marketplace

Petitioners began looking for a new profit-making activity immediately after they realized that they could not make a profit from their rodeos and horses.

The Cotton Picking Fair, an arts and craft fair, was held in Gay twice each year, including 1991 and 1992. It was held across the road from petitioners' farm. The Cotton Picking Fair had been held for about 20 years. It had about 250 exhibitors, each of whom had to be accepted by a panel of experts.

In 1991 and 1992, some vendors who could not participate in the Cotton Picking Fair asked petitioners if they could rent space for booths on petitioners' land from which to sell goods during the fair. A neighbor who had rented space to vendors during the fair helped petitioners do the same. Mrs. Brockenbrough negotiated with the vendors. Petitioners charged up to $100 to rent 10' x 10' spaces to vendors on September 29 and October 4, 1992. Mrs. Brockenbrough rented space to about 50

vendors.  Because of their success in the fall of 1992,
petitioners decided to hold their own fair, called the Great Gay,
Georgia, Marketplace, twice a year, when the Cotton Picking Fair
is held.

E.   Petitioners' Tax Returns

Petitioners reported the following gross receipts, losses,
and depreciation for 1991 and 1992:

| Year | Gross receipts | Losses (including depreciation) | Depreciation |
|---|---|---|---|
| | | Antiques | |
| 1991 | $1,885 | ($10,952) | $2,594 |
| 1992 | 2,589 | (9,830) | 2,443 |
| | | Horses and Rodeos | |
| 1991 | 3,947 | (40,746) | 4,426 |
| 1992 | 21,589 | (44,600) | 8,146 |

Petitioners reported their horse and rodeo undertakings on
the same schedule in 1991 and 1992.  Petitioners had gross
receipts from their fair in 1992 of about $3,020 with no expenses
or depreciation.

II.  OPINION

Respondent concedes that petitioners operated the rodeos for
profit.  We must decide whether petitioners operated their
antique store for profit in 1991 and 1992.  We must also decide
whether petitioners' horse and rodeo undertakings were one
activity, and if so, whether they operated that activity for
profit in 1991 and 1992.  Finally, we must decide whether
petitioners are liable for the accuracy-related penalty for

negligence under section 6662 for 1991 and 1992. The burden of proof on all issues in dispute in this case is on petitioner. Welch v. Helvering, 290 U.S. 111, 115 (1933).

A.   Whether Petitioners Operated Olde Bank Antiques for Profit in 1991 and 1992

Petitioners contend that they operated Olde Bank Antiques for profit in 1991 and 1992. An activity is conducted for profit if it is conducted with an actual and honest profit objective. Osteen v. Commissioner, 62 F.3d 356, 358 (11th Cir. 1995), affg. in part and revg. on other issues T.C. Memo. 1993-519; Surloff v. Commissioner, 81 T.C. 210, 233 (1983); Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). In deciding whether petitioners operated the antique shop and farm for profit, we apply the nine factors listed in section 1.183-2(b), Income Tax Regs. The nine factors are: (1) The manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his or her advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that the assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are

involved.  No single factor controls.  Sec. 1.183-2(b), Income Tax Regs.  The burden of proof is on petitioners.  Welch v. Helvering, 290 U.S. 111, 115 (1933).

Petitioners offered very little to support their contention that they operated their antique store for profit in 1991 and 1992 or any other year.  Mrs. Brockenbrough operated the store, but did not testify, although she was present at trial.  We infer that petitioners have no stronger evidence available to support their position about the store.  Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158 (1946), affd. 162 F.2d 513 (10th Cir. 1947).

1.    Manner in Which the Activity is Conducted

Conducting an activity in a manner substantially similar to comparable businesses which are profitable may indicate that a taxpayer conducted the activity for profit.  Engdahl v. Commissioner, 72 T.C. 659, 666-667 (1979).

Petitioners offered little evidence about the business activity of the store.  There is no evidence that petitioners had any business plan for the activity.  Petitioners did not advertise in 1991 or 1992.  At trial, Mr. Brockenbrough did not know what items petitioners sold or had in inventory during the years in issue, and he admitted that he knew in 1991 that their antique business could never be profitable.  In the years in issue, petitioners opened the store only part time and they left

a sign in the window for people to call them if they wanted to see something in the store.  This factor favors respondent.

2.    The Expertise of the Taxpayers or Their Advisors

Preparation for an activity by extensive study of its accepted business, economic, and scientific practices, and consultation with experts in the business, may indicate that the taxpayer entered into the activity for profit.  Sec. 1.183-2(b)(2), Income Tax Regs.  Petitioners had no experience operating a retail store.  Petitioners spoke to a couple of people about operating an antique store, but, the record contains little detail about the substance of those conversations, and there is no evidence that petitioners sought any advice about how to correct the store's losses in the years in issue.  See Engdahl v. Commissioner, supra at 668 (continuous consultation with experts showed profit motive).  This factor favors respondent.

3.    Taxpayer's Time and Effort

The fact that a taxpayer devotes much time and effort to conducting an activity may indicate that the taxpayer has a profit objective.  Sec. 1.183-2(b)(3), Income Tax Regs.  There is virtually no evidence about how Mrs. Brockenbrough spent her time at the store.  Petitioners did not operate the store on a full-time basis after 1990.  This factor favors respondent.

4.    Expectation That the Property Used in the Activity
      Would Appreciate in Value

The fact that a taxpayer expects assets used in an activity
to appreciate in value may indicate that the taxpayer has a
profit objective.  Sec. 1.183-2(b)(4), Income Tax Regs.  The term
"profit" includes appreciation in the value of assets used in the
activity.  Id.  Petitioners expected the building to appreciate
in value.  This factor favors petitioners.

5.    Taxpayer's Success in Other Activities

The fact that a taxpayer has previously engaged in similar
business activities and converted them from unprofitable to
profitable may show that the taxpayer has a profit objective,
even though the activity is presently unprofitable.  Sec. 183-
2(b)(5), Income Tax Regs.  Petitioners had not previously engaged
in similar business activities.  This factor favors respondent.

6.    Taxpayer's History of Income or Losses

A history of substantial losses may indicate that a taxpayer
did not conduct an activity for profit.  Golanty v. Commissioner,
72 T.C. 411 (1979), affd. without published opinion 647 F.2d 170
(9th Cir., 1981); sec. 1.183-2(b)(6), Income Tax Regs.  However,
a taxpayer may have a profit objective even when the activity has
a history of losses.  Bessenyey v. Commissioner, 45 T.C. 261, 274
(1965), affd. 379 F.2d 252 (2d Cir. 1967).  A series of losses

during the initial stage of an activity does not necessarily indicate that the activity was not conducted for profit. Engdahl v. Commissioner, supra at 669; sec. 1.183-2(b)(6), Income Tax Regs.

The antique store was not profitable during any of the 4 years it was open. Petitioners did little or nothing to sell the building and inventory during the 2 years after they knew the business could not be profitable. They liquidated their inventory at an auction in 1992. They did not explain why they waited that long or show that their inventory was difficult to liquidate. During the period of delay, petitioners continued to depreciate the building and incur expenses for mortgage, interest, repairs, maintenance, and utilities for the building. For 1991, they reported gross receipts of $1,885, cost of goods sold of $1,802, and expenses of $11,035. For 1992, they reported gross receipts of $2,589, cost of goods sold of $4,743, and expenses of $7,496.

This factor favors respondent.

7. Amount of Occasional Profits, if Any

Small occasional profits with large continuous losses do not establish that the taxpayer had a profit objective. Sec. 1.183-2(b)(7), Income Tax Regs. This factor generally applies to

losses that persist over a long period of time and which are not due to unforeseen circumstances. See Phillips v. Commissioner, T.C. Memo. 1997-128; Briggs v. Commissioner, T.C. Memo. 1994-125; Leonard v. Commissioner, T.C. Memo. 1993-472. The antique store never made a profit. This factor favors respondent.

8. Financial Status of the Taxpayer

Substantial income from sources other than the activity, causing the losses to generate large tax benefits, may indicate that the taxpayer is not conducting the activity for profit. Sec. 1.183-2(b)(8), Income Tax Regs. Petitioners' losses sheltered a large amount of their income in 1991 and 1992. This factor favors respondent.

9. Elements of Personal Pleasure

The presence of recreational or personal motives in conducting an activity may indicate that the taxpayer is not conducting the activity for profit. Sec. 1.183-2(b)(9), Income Tax Regs. However, a taxpayer's enjoyment of an activity does not show that the taxpayer lacks a profit objective if the activity is conducted for profit as shown by other factors. Jackson v. Commissioner, 59 T.C. 312, 317 (1972); sec. 1.183-2(b)(9), Income Tax Regs. Mrs. Brockenbrough likes antiques, and the record contains little to show she had a profit objective.

This factor favors respondent.

10.  Petitioners' Other Contention

Petitioners point out that petitioners were audited for 1988, and that respondent's agents who conducted that audit did not tell petitioners that they thought petitioners lacked a profit motive for their antique activity.  Petitioners contend that this shows that they had a profit motive for their antique activity in 1991 and 1992.  We disagree.  The Commissioner's failure to raise an issue in a prior audit does not estop the Commissioner from raising it in an audit for a later year.  See Knights of Columbus Council No. 3660 v. United States, 783 F.2d 69, 73 (7th Cir. 1986); Hawkins v. Commissioner, 713 F.2d 347, 351-352 (8th Cir. 1983), affg. T.C. Memo. 1982-451.

11.  Conclusion

We conclude that petitioners did not conduct their antique activity for profit in 1991 and 1992.

B.  Whether Petitioners' Horse and Rodeo Undertakings Were One Activity

Respondent contends that petitioners' horse and rodeo undertakings were two activities.

The applicable regulations state that, generally, the most important factors are the degree of organizational and economic interrelationship of the undertakings, the business purpose

served by carrying on the undertakings separately or together, and the similarity of the undertakings.  Sec. 1.183-1(d)(1), Income Tax Regs.[4]  The Commissioner generally accepts a taxpayer's characterization of two or more undertakings as one activity unless it is artificial or unreasonable.  Id.

---

[4] Sec. 1.183-1(d)(1), Income Tax Regs., provides in part:

(d)  Activity defined--(1)  Ascertainment of activity.  In order to determine whether, and to what extent, section 183 and the regulations thereunder apply, the activity or activities of the taxpayer must be ascertained.  For instance, where the taxpayer is engaged in several undertakings, each of these may be a separate activity, or several undertakings may constitute one activity.  In ascertaining the activity or activities of the taxpayer, all the facts and circumstances of the case must be taken into account.  Generally, the most significant facts and circumstances in making this determination are the degree of organizational and economic interrelationship of various undertakings, the business purpose which is (or might be) served by carrying on the various undertakings separately or together in a trade or business or in an investment setting, and the similarity of various undertakings.  Generally, the Commissioner will accept the characterization by the taxpayer of several undertakings either as a single activity or as separate activities.  The taxpayer's characterization will not be accepted, however, when it appears that his characterization is artificial and cannot be reasonably supported under the facts and circumstances of the case.  If the taxpayer engages in two or more separate activities, deductions and income from each separate activity are not aggregated either in determining whether a particular activity is engaged in for profit or in applying section 183.  * * *

We have applied various factors in deciding whether a taxpayer's characterization of several undertakings as one activity is unreasonable for purposes of section 183, such as: (a) Whether the undertakings share a close organizational and economic relationship, (b) whether the undertakings are conducted at the same place, (c) whether the undertakings were part of a taxpayer's efforts to find sources of revenue from his or her land, (d) whether the undertakings were formed as separate businesses, (e) whether one undertaking benefited from the other, (f) whether the taxpayer used one undertaking to advertise the other, (g) the degree to which the undertakings shared management, (h) the degree to which one caretaker oversaw the assets of both undertakings, (i) whether the taxpayers used the same accountant for the undertakings, and (j) the degree to which the undertakings shared books and records. Keanini v. Commissioner, 94 T.C. 41, 46 (1990); Hoyle v. Commissioner, T.C. Memo. 1994-592; De Mendoza v. Commissioner, T.C. Memo. 1994-314; Scheidt v. Commissioner, T.C. Memo. 1992-9; Trafficante v. Commissioner, T.C. Memo. 1990-353; Schlafer v. Commissioner, T.C. Memo. 1990-66.

Applying these factors, we conclude that the undertakings at issue were one activity. The rodeo and horse undertakings had a

close organizational and economic relationship. Rodeo and horse undertakings are complementary. The undertakings were both conducted at petitioners' farm and were both attempts to make the farm profitable. Mr. Brockenbrough and Bumgarner managed the rodeo and horse undertakings and their assets. Petitioners held rodeos in part to boost their horse business. Petitioners used some of their horses and cattle, the barn, and arena for both the farm and rodeos. Petitioners used the rodeos to advertise and sell their quarter horses. Petitioners used the same accountant for the horse and rodeo undertakings. Petitioners used the same checking account for their rodeo and horse undertakings and reported both undertakings on one schedule for each year in issue.

In Hoyle v. Commissioner, supra, the taxpayer bought a farm and then grew raspberries, soybeans, corn, and grain; guided hunting; boarded horses; raised horses and cattle; bred game birds; crabbed; raced thoroughbred horses; and participated in agricultural set-asides. According to Hoyle, those undertakings were one activity for purposes of section 183. This case is like Hoyle v. Commissioner, supra, in that petitioners were trying to find sources of revenue from their farm. See also Sparre v. Commissioner, T.C. Memo. 1980-45 (grain farm and gun club were

one activity).  It is also similar to cases where we held that horse breeding and other undertakings involving horses were one activity.  E.g., Scheidt v. Commissioner, supra (horse farm and stallion syndication); Mary v. Commissioner, T.C. Memo. 1989-118 (horse farm and horse racing); Yancy v. Commissioner, T.C. Memo. 1984-431 (same).  We conclude that petitioners operated their horse and rodeo undertakings as one activity under section 183.

C.   Whether Petitioners Operated Their Horse and Rodeo Activity for Profit

We next decide whether petitioners operated their horse and rodeo activity for profit.  We apply the factors described above at paragraph II-A.

1.   Manner in Which the Activity Is Conducted

Petitioners conducted their horse and rodeo activity in a businesslike manner.  They hired professional rodeo companies and a professional trainer.  They advertised their business in trade journals and in the local media.  Cashion credibly testified that petitioners established a solid operation by breeding good working quarter horses.

Maintenance of complete and accurate records may indicate that a taxpayer has a profit objective.  Elliott v. Commissioner, 90 T.C. 960, 971-972 (1988), affd. without published opinion 899 F.2d 18 (9th Cir. 1990); sec. 1.183-2(b), Income Tax Regs.

Petitioners kept financial records as requested by their accountant and had a separate checking account for their horse and rodeo activity.

A change in operating methods can indicate that a taxpayer has a profit motive. Ronnen v. Commissioner, 90 T.C. 74, 93 (1988); sec. 1.183-2(b)(1), Income Tax Regs. Petitioners changed their operating methods in response to their circumstances. They abandoned their horse and rodeo activity as soon as they were convinced that it would be unprofitable and began to operate a fair.[5]

Respondent contends that petitioners' decision to abandon this activity before the end of the second year of operations shows that they lacked a profit objective. We disagree. We believe that it shows that petitioners adjusted quickly to their situation.

Respondent points out that petitioners did not have a written business plan before starting their horse and rodeo activity, and contends that this shows that they lacked an intent to make a profit. We disagree. A taxpayer's actions can

---

[5] Respondent contends that we should not consider evidence offered by petitioners relating to their operation of a fair on their farm after the years at issue. We have not considered that evidence in deciding this case.

constitute a business plan, even if there is no written plan. See <u>Phillips v. Commissioner</u>, T.C. Memo. 1997-128 (written financial plan not required for 32 horse farm where business plan evidenced by action). Petitioners' business plan was evidenced by their actions: Petitioners consulted with experts, built a barn and arena, hired Bumgarner and professional rodeo producers, bought mares in foal, registered their horses with the American Quarter Horse Association, and advertised. This factor favors petitioners.

2. <u>The Expertise of the Taxpayers or Their Advisors</u>

Petitioners consulted with many people before beginning their horse and rodeo activity, including professional rodeo producers, local cowboys, a quarter horse expert, accountants, and bankers. They hired professional rodeo producers and Bumgarner to serve as a farm manager and trainer. A taxpayer's continuous and informal consultation with experts such as veterinarians, horse trainers, and other horse owners was a factor that showed that the taxpayers had a profit motive. <u>Engdahl v. Commissioner</u>, 72 T.C. at 668.

Respondent points out that petitioners did not pay for the advice that they received from people in the horse business. We do not think that this is unusual for a new business.

Jordan and Mr. Brockenbrough testified that Mr. Brockenbrough consulted with Jordan about horse breeding and training, rodeos, and fairs.  Respondent contends that Jordan had no experience with the horse business or fairs.  We disagree. Jordan had raised horses, and had prepared several tax returns for people who participate in the Cotton Picking Fair.  Jordan also had been associated with the Cotton Picking Fair for 25 years.

Respondent points out that there is no evidence that Bumgarner had operated a horse operation for profit.  However, Bumgarner had a good reputation as a trainer and rodeo operator. There is no indication that petitioners should have known that Bumgarner would misuse their property.  Respondent also contends that Bumgarner's low salary shows that he was not qualified.  We disagree.  Cashion testified that a manager such as Bumgarner would typically be paid a salary such as petitioners paid plus a percentage of income earned in the activity.

This factor favors petitioners.

3.    Taxpayer's Time and Effort

Mr. Brockenbrough spent a lot of time and effort in the horse and rodeo activity.  He did bookkeeping, horse registration, and manual labor such as putting up hay and

cleaning stalls.  He installed the rodeo bleachers and arenas and cleaned up after the rodeos.

Respondent contends that petitioners could not have been successful because of their work for Delta.  We disagree. Petitioners relied on Bumgarner when they traveled.  The fact that a taxpayer devotes a limited amount of time to an activity does not necessarily indicate that he or she lacks a profit motive if the taxpayer hired and relied on a qualified manager. Sec. 1.183-2(b)(3), Income Tax Regs.  This factor favors petitioners.

4.  Expectation That the Property Used in the Activity Would Appreciate in Value

Petitioners expected during the years in issue that their animals would breed and increase in number and value.[6]  See Engdahl v. Commissioner, supra at 668-669 (taxpayers expected the value of their horses to appreciate); Arwood v. Commissioner, T.C. Memo. 1993-352 (same); Harvey v. Commissioner, T.C. Memo. 1988-13 (same).  This factor favors petitioners.

---

[6] We need not decide petitioners' claim that they expected the value of their farm land to appreciate.  Mr. Brockenbrough testified that he intended to retire on the farm and that he did not expect the land to appreciate significantly in value when he bought it.

5. <u>Taxpayer's Success in Other Activities</u>

Petitioners had not previously engaged in similar business activities.  This factor favors respondent.

6. <u>Taxpayer's History of Income or Losses</u>

Petitioners had losses from their horse and rodeo activity in 1991 and 1992.  However, those were their first 2 years, and several events occurred beyond their control such as the fescue virus, untimely death of some of their horses, and Bumgarner's improper conduct.  Losses sustained because of circumstances beyond the taxpayer's control do not indicate that the taxpayer lacked a profit objective.  Sec. 1.183-2(b)(6), Income Tax Regs.

Respondent contends that the death and illness of some of petitioners' horses and Bumgarner's bad conduct were due to petitioners' absences.  We disagree.  Petitioners reasonably relied on Bumgarner.  Their presence would not have prevented the fescue problem or the deaths of their horses.  We conclude that this factor is neutral.

7. <u>Amount of Occasional Profits, if Any</u>

Petitioners discontinued their horse and rodeo activity after 2 years.  We conclude that this factor is neutral.

8. <u>Financial Status of the Taxpayer</u>

Petitioners' losses sheltered a large amount of their income in 1991 and 1992.  This factor favors respondent.

9. <u>Elements of Personal Pleasure</u>

Petitioners did not conduct their horse and rodeo activity for their personal pleasure. Mr. Brockenbrough wanted to live on a farm after he retired from Delta, but this fact does not show that petitioners lacked a profit objective. This factor favors petitioners.

10. <u>Respondent's Other Contention</u>

Respondent contends that Mr. Brockenbrough's letter to the Meriwether Cattlemen's Association dated February 23, 1992, in which he said that he hoped that he would "at least break even for once" shows that petitioners did not have a profit motive. We disagree. We believe respondent is misconstruing Mr. Brockenbrough's statement in that letter, and that the letter shows that petitioners wanted to make money.

11. <u>Conclusion</u>

Petitioners conducted their horse and rodeo activity in a businesslike manner, consulted experts, kept adequate records, developed expertise in the business, did not own the horses for personal pleasure, and adjusted their plan in their attempt to make a profit. Mr. Brockenbrough spent many hours performing physical labor and menial chores. Petitioners abandoned their horse and rodeo activity because of the death of some of their horses, difficulties with Bumgarner, and other causes beyond

petitioners' control.  We conclude that petitioners had a good faith intent to make a profit from their horse and rodeo activity.

D.  Whether Petitioners Are Liable for the Penalty Under Section 6662 for Negligence

Respondent determined that petitioners are liable for the accuracy-related penalty for negligence for 1991 and 1992 under section 6662.  Taxpayers are liable for a penalty equal to 20 percent of the part of the underpayment to which section 6662 applies.  Sec. 6662(a).  Negligence includes a failure to make a reasonable attempt to comply with internal revenue laws or to exercise ordinary and reasonable care in preparing a tax return.  Sec. 6662(c).  The accuracy-related penalty does not apply to any part of an underpayment to the extent the taxpayer shows that he or she had reasonable cause and acted in good faith.  Sec. 6664(c)(1).

Respondent's agents did not question whether petitioners had a profit objective in conducting their antique activity when they audited petitioners for 1988.  Respondent's failure to raise this issue for 1988 does not help them avoid liability for the accuracy-related penalty for 1991 and 1992.

Petitioners deducted a substantial amount of losses during the extended time from when they realized that the antique activity could never be profitable.  We conclude that petitioners

negligently deducted losses attributable to their antique
activity in 1991 and 1992.

    To reflect the foregoing,


                              <u>Decision will be entered</u>

                         <u>under Rule 155</u>.