THOMAS O. AND CAROL J. ELLIOTT, PETITIONERS *v.*
COMMISSIONER OF INTERNAL REVENUE,
RESPONDENT

Docket No. 10175-85.          Filed May 11, 1988.

---

*Wayne A. McFadden,* for the petitioners.
*Thomas R. Mackinson,* for the respondent.

WRIGHT, *Judge:* By a notice of deficiency dated January 24, 1985, respondent determined a deficiency of $7,825 in petitioner's 1981 Federal income taxes and additions to tax in the amounts of $590, $671, and 50 percent of the statutory interest due on $7,825 under sections 6651(a)(1), 6653(a)(1), and 6653(a)(2), respectively.

After concessions, the issues for our consideration are (1) whether petitioners' activities in 1981 with regard to an Amway distributorship constitute an activity engaged in for profit within the meaning of section 183,[1] and, if so, what amount, if any, are petitioners entitled to properly claim on their 1981 Federal income tax return as deductions for business expenses and for depreciation, (2) whether petitioners are liable for the addition to tax under section 6651(a)(1) for failure to timely file their income tax return for taxable year 1981, and (3) whether the underpayment of petitioners' income tax was due to negligence or intentional disregard of rules and regulations.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulations and exhibits attached thereto are incorporated herein by reference.

---

[1] Unless otherwise indicated, all section references herein are to the Internal Revenue Code of 1954 as amended and in effect during the year in issue. All Rule references are to the Tax Court Rules of Practice and Procedure unless otherwise provided.

Petitioners Thomas O. and Carol J. Elliott, husband and wife, resided in Millbrae, California, at the time the joint petition was filed. Petitioners were calendar year taxpayers who used the cash basis method of accounting. On June 15, 1982, petitioners filed a 15-page joint Federal income tax return for the taxable year 1981. Petitioners reported joint gross income in the amount of $48,256 and claimed a business loss of $15,180.

During 1981, both petitioners were employed in full time jobs. Mr. Elliott was employed as a mechanic and shop foreman for Mark IV Charter Lines. Mrs. Elliott was employed in the accounts receivable department of Olympic Co., a fully owned subsidiary of Mitsubishi Corp. of Japan.

The issues in this case concern petitioners' activities with regard to Amway Corp. (Amway), as petitioners were Amway distributors during the year in issue. Amway is perhaps best known for its grassroots marketing strategy. Independent Amway distributors generally sell products to friends and neighbors at parties or informal gatherings held in the homes of the Amway distributors. For each sale above a certain minimum, the Amway distributor makes a percentage computed under a graduated schedule.[2]

In addition to a percentage of his own sales volume, an Amway distributor may earn income by encouraging other individuals to join Amway as distributors. The original Amway distributor is called an "upline" distributor in relation to his new recruit, the "downline" distributor. The upline distributor receives a percentage of the sales achieved by the downline distributors[3] in his "chain of distribution" even though he does not participate in their sales. If a downline distributor engages another individual to be his downline distributor, the upline distributor takes a percentage of the sales of both downline distributors, even though he had nothing to do with the activities of the new downline distributor. Thus, to maximize Amway-related

---

[2]The percentage of sales volume the Amway distributor receives is called the "discount" and averages between 15 and 35 percent of the cost of each item sold.

[3]The percentage received by the upline distributor from the sales of the downline distributor is called "Point Value Bonus" or "PV Bonus." The PV bonus ranges from 3 percent to 25 percent of the point value, usually equaling between $100 per month to $7,500 or more per month. The point value is computed under a formula which incorporates both the volume and the value of monthly sales.

income, the distributor must sell the Amway products and also try to enlist other individuals as Amway distributors.

Petitioners were Amway distributors from 1979 to 1983. In the initial stages of the activity, they attended seminars and meetings and became familiar with the numerous Amway products. They approached potential customers by calling people who had been suggested to them by third parties. These potential customers would be invited to meetings held at petitioners' home. The setting was informal and refreshments would be served while petitioners demonstrated the Amway products. The meetings generally lasted between 3 and 4 hours and Mr. Elliott estimated that the meetings usually occurred at least once or twice a week. Petitioners frequently met with customers or potential downline distributors to discuss Amway matters over lunch or dinner at neighboring restaurants. Occasionally there were out-of-town meetings and educational conferences which petitioners attended. In August of 1981, petitioners attended a week-long Amway seminar held in Kona Village, Hawaii. Petitioners dedicated 20 to 40 hours a week between them to the Amway distributorship. In 1983, petitioners decided that they did not have enough time and energy to continue and ceased all activity related to the Amway distributorship.

Mr. Elliott indicated that he thought highly of the quality of the Amway products. His belief in his products made it easier for him to sell them. Petitioners purchased products for their own use as well as for demonstration purposes. Even after petitioners stopped selling Amway products, they continued to buy them.

The agenda of Amway meetings occasionally included tax advice and counseling. Amway distributors were counseled to keep their Amway activities separate from their personal activities. Petitioners also employed an accountant to assist them with the preparation of their Federal and State income tax returns for the taxable year 1980. This same accountant provided counseling during taxable year 1981.

On their 1981 Federal income tax returns, petitioners included a Schedule C on which they reported income and losses from the Amway activity. On that schedule, petitioners listed total income in the amount of $526 and claimed

deductions in the aggregate amount of $18,538. After some discussion with respondent's agents, petitioners submitted a revised Schedule C on which the deductions were reduced to an aggregate amount of $14,911. Petitioners concede that the difference, in the amount of $3,627, was properly disallowed. The deductions listed on the revised Schedule C comprise the subject matter of the dispute in this case. The following chart lists the items and the amounts of the deductions taken by petitioners on both the original and the revised Schedule C.

| Item | Original | Revised |
|---|---|---|
| Cost of goods sold | $2,832 | $2,071 |
| Freight | 113 | 0 |
| Car expenses | 3,241 | 3,006 |
| Depreciation (autos, furnishings) | 2,975 | 2,346 |
| Office supplies, postage | 121 | 32 |
| Insurance | 78 | 0 |
| Supplies | 100 | 0 |
| Rent | 2,323 | 1,288 |
| Security | 131 | 0 |
| Utilities, telephone | 1,110 | 240 |
| PV bonuses paid | 30 | 30 |
| Business gifts | 268 | 293 |
| Legal, professional | 1,180 | 1,245 |
| Educational supplies | 60 | 59 |
| Continuing education | 420 | 0 |
| Demonstrations, meetings, training | 1,206 | 819 |
| Advertising | 141 | 0 |
| Sales promotion | 1,942 | 565 |
| Travel and entertainment | 17 | 2,766 |
| Dues, publications | 250 | 151 |
| | 18,538 | 14,911 |

### Automobiles

Petitioners took deductions for depreciation and expenses with respect to two automobiles during taxable year 1981. At the time, petitioners owned three automobiles: a 1976 Dodge Special Edition Charger (the Dodge), a 1955 Ford pickup truck (the pickup), and a 1972 Volkswagen "beetle" (the Volkswagen). The pickup was not used at all for the Amway activity. The Volkswagen was used exclusively for Amway purposes,[4] while the Dodge was only used 65

---

[4] The Volkswagen was parked in the garage at all times when not in use in activities related to Amway.

percent of the time for Amway purposes. The other 35 percent represented Mrs. Elliott's personal use.[5]

Petitioners computed the depreciation deductions they claimed using 100 percent of the cost basis of the Volkswagen, in the amount of $2,700,[6] and 65 percent of the cost basis of the Dodge in the amount of $6,095. The Dodge had been purchased new in 1976 for $6,095. The Volkswagen had been purchased used for $2,700 at some time prior to the year in issue. Mr. Elliott explained that he used the cost basis of the Dodge, which was 5 years old by 1981, because he believed that, as a special edition car, it would never depreciate economically below the price that he had originally paid for it. He did not offer any evidence to support this view of the proper basis for depreciation. The depreciation deduction for the Volkswagen was computed under the Accelerated Cost Recovery System (ACRS) method at a rate of 25 percent of depreciable basis.[7] The depreciation deduction for the Dodge was computed using the straight-line method with a stated useful life of 3 years. Neither automobile had been subject to depreciation prior to 1981.

In addition to claiming a deduction for depreciation, petitioners deducted costs incurred in maintaining the Dodge and the Volkswagen. Petitioners supplied a breakdown of these expenses as they were computed to determine the revised figure in the amount of $3,006.

| Item | Cost |
| --- | --- |
| Repairs to Dodge ($868 × 0.65)................. | $564 |
| Repairs to Volkswagen........................ | 1,518 |
| Registration, Dodge ($46 × 0.65) ............... | 30 |
| Registration, Volkswagen ...................... | 22 |
| Allstate Motor Club ........................... | 29 |

---

[5]Mr. Elliott arrived at these figures by multiplying the number of miles between their home and his wife's place of employment and back by 250 days, representing the total number of days she worked in 1981. This number was subtracted from the total miles traveled that year, and the resulting ratio was 65 to 35. Mr. Elliott said he did add on some indeterminate amount for small errands around the neighborhood. Petitioners did not keep a record of their actual mileage for either car.

[6]During his testimony at trial, Mr. Elliott stated that the Volkswagen had cost $3,000 rather than $2,700 but every other reference to the cost of the Volkswagen, in both testimony and documentary evidence, indicates that $2,700 as the correct cost.

[7]For purposes of petitioners' State income tax, the two automobiles were subject to depreciation computed under the double-declining-balance method.

| Item | Cost |
|---|---|
| Tolls............................................ | $2 |
| Insurance ($594 $\times$ 0.82)[8] ....................... | 487 |
| Gasoline ($507 $\times$ 0.70) [9]........................ | 354 |
| | 3,006 |

In support for these claimed expenses, petitioners submitted photocopies of various canceled checks and bills or invoices. While the checks and invoices indicate what was purchased and the amount of the purchase, there is no notation on any of the items submitted which would indicate a relation to Amway activities. Furthermore, in each category of expenditure, the aggregate amount of the canceled checks does not necessarily equal the amount claimed by petitioners as deductions.[10] Petitioners did not explain these discrepancies at trial.

## Home Expenses

According to petitioners, their home was the fulcrum of their Amway activity, because the weekly meetings and informal social gatherings were indispensable to their success. Thus, petitioners deducted a portion of the expenses attributable to their home in the taxable year 1981. Petitioners stated that, during meetings, the entire downstairs floor of their residence was used. The garage was used exclusively for the storage of Amway products, literature, and the Volkswagen. Furthermore, Mr. Elliott maintained an office in the garage in which he worked on Amway matters.

On petitioners' revised Schedule C, they reduced the amount of deductions claimed with respect to the use of their home. The deduction claimed for the cost of rent was reduced from $2,323 to $1,346. The deduction claimed for

---

[8]Although this figure of 0.82 was not explained at trial or on brief, it appears to be the average of 100 percent, the ratio of alleged business use for the Volkswagen, and 65 percent, the ratio of alleged business use for the Dodge. The figure given for insurance represents a combined expense.

[9]Petitioners did not offer an explanation for the use of 70 percent. Perhaps they estimated that roughly a third of the gasoline purchased was consumed by the use of the pickup.

[10]For example, petitioners claimed a deduction attributable to the out-of-pocket costs associated with automobile insurance. To this end, petitioners submitted photocopies of three canceled checks in the amounts of $279, $155, and $315. However, in computing the deduction, petitioners only added two of these items, in the amounts of $279 and $315, and then deducted only 82 percent of the total. Petitioners' reason for this course of action was not explained.

the cost of utilities was reduced from $1,110 to $240. Although petitioners submitted photocopies of canceled checks in the aggregate amount of $433.48 to support their original claim, they reduced that amount to $240 without explanation.

With respect to the amount finally claimed on the revised Schedule C, petitioners submitted several telephone bills in addition to the checks which had been issued to satisfy them. Each check satisfied the whole obligation of the telephone bill. Petitioners did not mention having a separate telephone line installed for use in the Amway distributorship. Thus, petitioners claimed a deduction for all of their phone usage on the grounds that it was devoted to Amway activity.

In 1981, petitioners moved into a new apartment and in December of that year bought new furniture and furnishings. These included draperies, end tables, coffee tables, bar stools, and other furnishings. The total cost of these items was $752.30, for which petitioners claimed deductions for depreciation with respect to these items. Using a cost basis in the amount of $752, petitioners computed depreciation under the ACRS method resulting in total depreciation claimed in the amount of $113. Petitioners also claimed depreciation for furniture purchased prior to 1981 using the straight-line method and a basis of $1,176. This resulted in a depreciation deduction in the amount of $236 with total depreciation for furnishings in the amount of $349.

### Amway Expenses

Petitioners claimed deductions for certain items which they claimed were directly necessary to the conduct of the Amway activity. Petitioners claimed deductions for office supplies, postage, entertainment supplies, and refreshments for the demonstrations and meetings, education and continuing education expenses, advertising, sales promotions, and freight charges. Although some of these items were substantiated by bills or checks, many were not. Petitioners failed to explain the deductions for education, continuing education, advertising, and postage.

Under the heading of "Sales Promotion," petitioners submitted bills and guest checks from various restaurants

near their home. The copies of bills which were introduced into evidence by petitioners added up to an aggregate expense in the amount of $165.93, although petitioners listed the total as $565.22 on their Schedule C. Petitioner also claimed a deduction in the amount of $151 for subscriptions to newspapers and magazines. Mr. Elliott explained that these magazines were necessary for the customers and clients to peruse while they waited for the meeting to start.[11]

Petitioners claimed a deduction for PV bonuses paid to Ken Chiatello in the aggregate amount of $30.94. Ken Chiatello was petitioners' only downline distributor. Petitioner submitted order forms indicating total purchases from his upline distributor in the aggregate amount of $2,070.63. On the original Schedule C, petitioners had claimed a deduction for purchases in the amount of $2,832, but the figure on the revised Schedule C was changed to $2,071. The order forms did not indicate who would be the ultimate buyer of the ordered products.

## Travel and Entertainment Expenses

On the original Schedule C, petitioner claimed deductions for travel and entertainment expenses in the amount of $17. On the revised Schedule C, that figure was increased to $2,766. Petitioner submitted bills and invoices from the week-long trip to Hawaii during which petitioners attended an Amway seminar. The aggregate expenses, including airfare and hotel bills, equaled $2,766.

## Miscellaneous Business Expenses

Petitioners claimed a deduction for legal and professional expenses in the amount of $1,180 on the original Schedule C, and $1,245 on the revised Schedule C. Of this amount, $1,005 was paid to Vikki Miller, Mrs. Elliott's daughter and Mr. Elliott's step-daughter. Mr. Elliott explained that Vikki Miller assisted in hosting the demonstrations and meetings which were held in the Elliott home. She received $5 per hour for her efforts. In addition to the services of Vikki

---

[11]There was a discrepancy between the Schedule C and Mr. Elliott's testimony at trial. At trial, he indicated that the San Mateo Times was ordered for his exclusive personal enjoyment and yet it, too, appeared on the list of deductible subscriptions.

Miller, petitioners enjoyed the services of an accountant who prepared their returns and for which they issued a check in the amount of $140. Petitioners claimed an expense in the amount of $100 for a subscription to the publications of the National Tax Institute.

Petitioners claimed a deduction for business gifts in the amount of $268 on the original Schedule C and in the amount of $293 on the revised Schedule C. Of the total amount claimed, only $224 was supported by bills or invoices. Some of the invoices indicated whom the recipient of the gift was to be, and some did not.

In addition to the copies of checks and bills, petitioners submitted a diary. They kept a record in the diary for every day that they conducted the Amway distributorship. Mrs. Elliott indicated that it was usually Mr. Elliott who kept the diary. The typical diary entry would include only the date and a name of a person or a place. If a person was named, he or she might be designated as a "prospect," a potential downline distributor, or a "customer."

## OPINION

The first issue for our decision is whether respondent properly disallowed petitioners' deductions for costs incurred in the conduct of the Amway activity. These expenses were comprised primarily of purported business expense deductions although petitioners claimed a deduction for the depreciation of automobiles and household furnishings as well. Resolution of this issue depends on whether petitioners entered into the Amway activity with the actual and honest objective of making a profit.

In order to take deductions with respect to business expenses, the expense must be ordinary and necessary in carrying on a trade or business. Sec. 162(a). If the activity fails to rise to the level of a trade or business, the costs incurred in maintaining it may be deductible as expenses incurred in the production of income if the expenses are ordinary and necessary to the production or collection of income. Sec. 212. However, section 262 precludes the taxpayer from claiming a deduction for personal, living, or family expenses which were not incurred in the conduct of a trade or business or in the production of income. Finally, in

order to take a depreciation deduction with respect to an asset, the asset must be used in a trade or business or held for the production of income within the meaning of section 167(a). In order to establish that the Amway activity was either a trade or business or that it was engaged in to produce income, petitioners must demonstrate that they engaged in the Amway activity with the intent to make a profit.

Whether petitioners engaged in the Amway distributorship for profit depends on whether the activity was undertaken with an "actual and honest objective" of making a profit. *Fuchs v. Commissioner,* 83 T.C. 79, 98 (1984); *Dreicer v. Commissioner,* 78 T.C. 642, 646 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). While a reasonable expectation of a profit is not required, petitioners must have entered into the activity, or continued it, with the objective of making a profit. *Golanty v. Commissioner,* 72 T.C. 411 (1979), affd. without opinion 647 F.2d 170 (9th Cir. 1981); *Engdahl v. Commissioner,* 72 T.C. 659, 666 (1979); *Bessenyey v. Commissioner,* 45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967), cert. denied 389 U.S. 931 (1967). Furthermore, transactions which serve no "purpose, substance, or utility apart from their anticipated tax consequences" are disregarded for tax purposes. *Knetsch v. Commissioner,* 364 U.S. 361 (1960); *Goldstein v. Commissioner,* 364 F.2d 734, 740 (2d Cir. 1966), affg. 44 T.C. 284 (1965).

The determination of whether a profit motive exists is to be resolved on the basis of all the extenuating facts and circumstances. *Elliott v. Commissioner,* 84 T.C. 227, 236 (1985), affd. without published opinion 782 F.2d 1027 (3d Cir. 1986); *Golanty v. Commissioner, supra* at 426. Although section 183 is an allowance provision, not a disallowance provision, respondent's regulations promulgated under that section have historically been employed to facilitate the determination of the existence of a profit motive. Respondent's regulations set forth nine relevant factors. Sec. 1.183-2(b), Income Tax Regs.[12] No single factor is control-

---

[12]These factors are (1) the manner in which the taxpayer carries on an activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) expectation that the assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6)

ling. *Golanty v. Commissioner, supra* at 425-426. In this analysis, greater weight is accorded to proved objective facts than to mere statements of intent. *Beck v. Commissioner,* 85 T.C. 557, 570 (1985); *Siegel v. Commissioner,* 78 T.C. 659, 699 (1982).

Respondent disallowed all the deductions taken by petitioners on both the original and the revised Schedules C. Respondent contends that petitioners did not engage in the Amway activity to make a profit but, instead, were chiefly interested in increasing the deductions they could claim. Respondent also argues that the items which petitioners deducted as business expenses were really used for petitioners' own personal use and enjoyment. Respondent maintains that petitioners have failed to demonstrate that the expenses incurred were ordinarily and necessarily incurred in the conduct of the trade or business or for the production of income. Finally, respondent maintains that petitioners failed to provide adequate evidence to substantiate their claimed deductions.

Petitioners contend that their Amway activity constituted a trade or business within the meaning of section 162 and, that therefore, all their related expenses were deductible. They further contend that the records they have submitted as evidence substantiate their claim. Petitioners bear the burden of proving that they engaged in the Amway distributorship with the intent to make a profit and that the deductions they claimed on Schedule C were properly taken. *Welch v. Helvering,* 290 U.S. 111, 115 (1933); Rule 142(a).

For the reasons discussed below and based on our consideration of all the facts and circumstances, we conclude that the activity of petitioners with respect to their Amway distributorship was not engaged in with the intent to make a profit. Therefore, petitioners are not entitled to take deductions for business expenses and for depreciation.

The most significant feature of petitioners' Amway activity is the singularly unbusinesslike manner in which it was conducted.[13] Records were kept in a cursory and sloppy

---

the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) elements of personal pleasure or recreation.

[13]See *Ferrell v. Commissioner,* T.C. Memo. 1987-102.

fashion and consisted of a few notes in the diary or a single word notation on a bill or invoice. Petitioners did not record how many products they sold to customers, making it impossible to determine the success of their sales efforts. However, the small amount of their reported Amway income in the amount of $562 for the taxable year indicates that petitioners were not very successful. If Mr. and Mrs. Elliott were running a genuine business, they would have maintained much better records indicating, among other things, who their customers were, where and when they met with them, what products they had sold them, and which methods had been successful. They would have kept track of the actual mileage dedicated to the Amway activity on the different automobiles. They would have kept a record of the time spent entertaining in their home. They could have supplied programs or schedules substantiating their claim that the purpose of the out-of-town trips pertained to Amway activity.

There is no excuse for petitioners' failure. Although petitioners were both inexperienced in retail selling when they commenced their Amway activities, they had 2 years to learn their trade before the taxable year in issue. Obviously, petitioners learned little from their 2 years of experience because in 1981, they only generated income of $562 from the sale of Amway products.[14] The rest of the Amway products ordered must have been purchased by petitioners themselves. Although they alleged that they spent 20 to 40 hours a week at their Amway endeavor, by 1981, they had only enlisted one downline distributor, Ken Chiatello. Because they only paid PV bonuses in the amount of $30, there is evidence that Chiatello was not a prolific salesman himself. If petitioners had been ordinary business-men they would have tried to help Ken Chiatello increase his sales volume. Furthermore, because petitioners were both employed at full-time jobs, neither had very much time to devote to selling Amway products.

A further indication of the unbusinesslike fashion in which petitioners conducted their Amway activity was the thin line dividing business activities from personal and

---

[14]See *Alcala v. Commissioner,* T.C. Memo. 1984-664 (the absence of income from the taxpayer's welding activity indicated that profit was not the true motive).

recreational activities. Petitioners offered scant evidence that their Amway activity required them to do anything other than to maintain an active social life. Although they occasionally attended seminars, most of their activity involved giving parties and taking people out to restaurants. While there is no requirement that profit-oriented work be onerous and unpleasant, the evidence presented by petitioners does not indicate activity motivated by a profit objective. On the contrary, the evidence shows that petitioners made some small modifications in their routine social life, kept cursory notes about their activities, and claimed deductions for the cost of nearly everything they owned or did. On this record, we find as a fact that petitioners' activities were motivated by a desire to avoid tax rather than a desire to generate income.

In light of the lack of evidence to support petitioners' claim that their Amway activity was engaged in to produce profit, we conclude that the Amway activity was a vehicle for claiming deductions for expenses attributable to personal and recreational activities. Because the activity was not engaged in for profit, petitioners were not entitled to the deductions they claimed for business expense and for depreciation, except as allowed by section 183(b).

The second issue for our consideration is whether petitioners are liable for an addition to tax for failure to timely file their return pursuant to section 6651(a)(1). Section 6651(a)(1) provides for an addition to tax for failure to timely file a return unless the taxpayer can prove that the failure to file is due to reasonable cause and not due to willful neglect. Although due on April 15, 1982, petitioners' 1981 tax return was not filed until June 15, 1982. Petitioners have the burden of proving this issue as well as all others. *Bebb v. Commissioner,* 36 T.C. 170, 173 (1961).

Petitioners' treatment of the section 6651(a)(1) issue on brief was extremely limited. Petitioners merely denied that section 6651(a)(1) should be applied to them. However, a naked denial alone will not suffice to rebut the presumption of the correctness of respondent's determinations. *Abramo v. Commissioner,* 78 T.C. 154, 163 (1982). Petitioners did not demonstrate a reasonable cause for their failure to file by April 15, 1982. Thus, we conclude that respondent's

determination of an addition to tax pursuant to section 6651(a)(1) is correct and will be upheld.

The third issue for our consideration is whether petitioners are liable for additions to tax under section 6653(a)(1). Respondent further requested that additional interest be asserted with respect to the portion of underpayment attributable to negligence as provided by section 6653(a)(2).

Section 6653(a)(1) provides for an addition to tax if any part of underpayment of tax is due to negligent or intentional disregard of the rules or regulations. Petitioners bear the burden of proving that the additions to tax determined by respondent should not be applied. *Hall v. Commissioner*, 729 F.2d 632 (9th Cir. 1984), affg. a Memorandum Opinion of this Court; *Hanson v. Commissioner*, 696 F.2d 1232, 1234 (9th Cir. 1982), affg. a Memorandum Opinion of this Court; *Luman v. Commissioner*, 79 T.C. 846, 860-861 (1982). Negligence under section 6653(a)(1) is lack of care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. *Neely v. Commissioner*, 85 T.C. 934, 947 (1985).

Petitioners claimed deductions in the amount of $15,180 on their original Schedule C. Of this amount, petitioners did not even try to defend a portion of the deductions in the aggregate amount of $3,627. Such a large volume of deductions, representing nearly a third of petitioners' joint gross income, would have put an ordinarily prudent taxpayer on notice that perhaps the situation was too good to be true. While petitioners claim that any underpayments in tax were attributable solely to ignorance, ignorance of the law cannot serve as an excuse. *Smith v. Commissioner*, T.C. Memo. 1982-140, affd. without published opinion 698 F.2d 1215 (5th Cir. 1983). There was evidence at trial that petitioners received tax advice from Amway throughout taxable year 1981. Furthermore, we conclude that if petitioners knew enough about the rules and regulations of the Internal Revenue Code of 1954 to claim the deductions they did, then they knew enough to know that an activity which is not engaged in for profit does not produce deductible expenses in excess of realized income.

Accordingly, we sustain respondent's determinations with respect to the additions to tax under section 6653(a)(1). We

also conclude, for purposes of the additions to tax under section 6653(a)(2), that all of petitioners' underpayment for 1981 was attributable to negligence or intentional disregard of rules and regulations.

To reflect concessions and the foregoing,

*Decision will be entered for the respondent.*