T.C. Memo. 2003-142

UNITED STATES TAX COURT

JORGE N. LOPEZ AND VIVIAN LOPEZ, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 8612-01.                    Filed May 20, 2003.

Jorge N. Lopez and Vivian Lopez, pro sese.

<u>David B. Mora</u>, for respondent.

MEMORANDUM OPINION

CARLUZZO, <u>Special Trial Judge</u>:  Respondent determined
deficiencies of $3,833 and $3,810 in petitioners' Federal income
taxes for the years 1998 and 1999, respectively.  The issue for
decision for each year is whether petitioners are entitled to
deductions for expenses incurred in connection with the sale and

distribution of Amway Corp. (Amway) products.  The resolution of this issue for each year depends upon whether petitioners' Amway distributorship was a trade or business within the meaning of section 162.[1]

Background

Some of the facts have been stipulated and are so found. Petitioners are husband and wife.  They filed a timely joint Federal income tax return for each year in issue.  At the time the petition was filed, petitioners resided in Houston, Texas.

Jorge Lopez holds a bachelor's and a master's degree in petroleum engineering.  At all relevant times he was employed full time as a petroleum engineer by Altura Energy, Ltd.  Vivian Lopez described her occupation as housewife and homemaker.

In 1996, an "upline"[2] distributor of Amway products recruited petitioners to act as "downline" distributors. Petitioners maintained this status throughout the years in issue. Some time after 1999, petitioners ceased their Amway activity and became involved in Quixtar, Inc., an Amway affiliate.

---

[1] Unless otherwise indicated, section references are to the Internal Revenue Code in effect for the years in issue, and Rule references are to the Tax Court Rules of Practice and Procedure.

[2] The term "upline" simply refers to one's relative position in a particular distribution chain of Amway products.  One becomes an upline distributor after successfully recruiting one or more "downline" distributors.

Amway is widely known as a marketer and supplier of various personal and household products. Amway relies on distributors to purchase such products for personal consumption and for resale to customers and downline distributors.[3] In general, a distributor's gross income is based on profit from retail sales, plus a "performance bonus" that is controlled by Amway and is influenced by the type and quantity of products the distributor purchases from Amway.

Profit from retail sales is determined by the difference between the wholesale price, which is set by Amway, and the retail price, which is set by the distributor. On average, Amway's suggested retail price for each product is approximately 25 percent above wholesale, but distributors are entitled to sell a product at whatever price they choose, even if a sale at that price produces a loss. Petitioners' practice was to sell products to their customers and downline distributors at cost, thereby eliminating product sales as a source of profit.

A distributor's performance bonus is determined by his or her "point value" and "business volume". Point value is a unitless number that corresponds to a particular tier in the Amway "performance bonus schedule". Business volume is a dollar amount generally equivalent to 87 percent of the suggested retail

---

[3] A customer purchases Amway products for personal consumption, but a distributor purchases Amway products intending to resell them to customers or other distributors.

price of a particular product.  Amway assigns a given point value and business volume to each product it sells but may change these figures at any time for any reason it chooses.[4]  Consequently, it is difficult to predict a performance bonus on the basis of the present point value and business volume of Amway products.  The performance bonus is calculated by multiplying a distributor's monthly business volume by a percentage that is listed in the performance bonus schedule and corresponds to the distributor's monthly point value.[5]  This percentage ranges from 3 to 25 percent and increases in steps as a function of point value.

Petitioners' Amway activities may be summarized as follows. Petitioners were recruited by an upline distributor of Amway products in 1996.  Petitioners had no prior experience with Amway and no prior experience running a business.  Before becoming Amway distributors, petitioners received advice from other Away distributors but did not seek the advice of independent business consultants.  During the course of their affiliation with Amway, petitioners relied on the advice of certain celebrated upline

---

[4] According to petitioners' exhibits, the ratio of business volume to point value ranges from 2.00 to 2.62.

[5] For example, assume that, in a given month, a distributor accumulates a point value of 1,000 and a business volume of $2,500.  According to Amway's performance bonus schedule, at a point value of 1,000, the performance bonus equals 12 percent of business volume.  Thus, in this example, the gross performance bonus is $300 (i.e., $2,500 x 0.12).  To determine the distributor's net performance bonus, this amount must be reduced by the dollar amount of bonuses owed to downline distributors.

distributors of Amway products.  Petitioners also received unsolicited, independent advice from their accountant, but apparently the advice was negative.

Instead of attempting to sell Amway products at a profit to customers/users, petitioners chose to concentrate on developing a network of distributors.  Consequently, their potential for profit was almost entirely dependent upon Amway's performance bonus program and the sales efforts of their downline distributors.  Recruiting productive downline distributors, therefore, was the key to petitioners' profit potential. Nevertheless, they made no effort to develop a profile of a successful downline distributor on which basis they would recruit; instead, petitioners recruited indiscriminately from family, friends, and acquaintances.  By the end of 1999, it appears that petitioners had recruited between 10 and 25 downline distributors but had only two regular customers--their neighbor and Mr. Lopez's mother.

The relationship between petitioners and their downline distributors was an informal one.  There were no contracts or minimum sales agreements.  Downline distributors were free to leave petitioners' distribution network at will and, if they desired, could even join another Amway distributorship under a different upline distributor.  Petitioners were not assigned a sales territory, and, like their downline distributors, they had

to compete with other Amway affiliates for sales and recruits. Petitioners' lack of control over their downline distributors hampered their ability to predict sales and, in turn, performance bonuses. Their difficulty in predicting performance bonuses was compounded by Amway's practice of varying the point value it assigned to a given product. Petitioners' lack of control over these key components of their distributorship caused any predictions of performance bonuses that they might have made to be, at best, uncertain.

Given their practice of selling Amway products at cost, petitioners' Amway distributorship could be profitable only if their performance bonuses exceeded their expenses. In order for this to occur, petitioners estimated that they would need to achieve and maintain a monthly point value of 4,000. However, petitioners had not actually made this determination for themselves; rather, they relied on statements to this effect by other Amway distributors and hypothetical examples in Amway brochures. During the years in issue, it appears that petitioners' point value did not exceed 372 in any given month.

As noted, petitioners filed a timely joint Federal income tax return for each year in issue. Included with each return is a Schedule C, Profit or Loss From Business. Petitioners' Schedule C for 1998 lists their principal business as "Amway Sales and Distribution". For 1999, petitioners' Schedule C lists

their principal business as "Sales:Distribution".  Petitioners
reported their Schedule C income and expenses for the years in
issue as follows:

| Income: | 1998 | 1999 |
|---|---|---|
| Gross receipts or sales | $7,139 | $7,061 |
| Less: cost of goods sold | 3,439 | 6,368 |
| Gross income | 3,700 | 693 |
| | | |
| Expenses: | | |
| Car/truck expenses | $6,901 | $6,238 |
| Supplies | 500 | 503 |
| Travel | 911 | 2,172 |
| Meals/entertainment | 742 | 868 |
| Utilities | 2,248 | 2,130 |
| | | |
| Other expenses: | | |
| Misc. business expense | 325 | 330 |
| Tools | 7,774 | 4,752 |
| Functions | 2,687 | 2,060 |
| Total expenses | 22,088 | 19,053 |
| | | |
| Net profit or (loss) | (18,388) | (18,360) |

Petitioners prepared a budget applicable to both years in
issue.  According to the budget, which consists of a single
handwritten page, financing petitioners' Amway activity would
cost $737 per month, or $8,844 per year.  The expenses deducted
on petitioners' returns are more than double the budgeted amount.

In the notice of deficiency, respondent disallowed
petitioners' Schedule C expenses on the ground that petitioners'
Amway activity was not entered into for profit.  However, to
the extent of income realized from this activity, respondent
allowed these expenses as miscellaneous itemized deductions on

Schedule A, Itemized Deductions.  Other adjustments made in the notice of deficiency are not in dispute.

Discussion

Burden of Proof

As a general rule, determinations made by the Commissioner in the notice of deficiency are presumed to be correct, and the taxpayer bears the burden of proving otherwise.  See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).  Moreover, it is settled that "'an income tax deduction is a matter of legislative grace and that the burden of clearly showing the right to the claimed deduction is on the taxpayer.'"  INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992) (quoting Interstate Transit Lines v. Commissioner, 319 U.S. 590, 593 (1943)).  Pursuant to section 7491(a), if the taxpayer introduces credible evidence with respect to any factual issue relevant to ascertaining the taxpayer's liability for tax, the burden of proof is placed on the Commissioner with respect to that issue.  For the burden of proof to shift to the Commissioner, however, the taxpayer must cooperate with reasonable requests by the Commissioner for witnesses, information, documents, meetings, and interviews.  See sec. 7491(a)(2)(B); Higbee v. Commissioner, 116 T.C. 438, 441 (2001).  Petitioners failed to satisfy this requirement insofar as they refused to meet with respondent's counsel before trial, refused to provide respondent's counsel with copies of

documents on which they intended to rely at trial, and refused to participate in the stipulation process contemplated by Rule 91.[6]

Trade or Business

According to petitioners, their Amway activity, at all relevant times, was a trade or business.  Therefore, petitioners argue, the expenses they incurred in carrying on this activity should be allowed as deductions.  See sec. 162(a).[7]  Respondent argues that petitioners were not carrying on a trade or business because they lacked the requisite profit objective, and petitioners are not, therefore, entitled to the deductions they claim, except to the extent allowed by section 183.[8]

---

[6] Petitioners explained that their refusal to cooperate with respondent's counsel was caused by their mistaken beliefs that (1) they elected to have this case heard as a small tax case pursuant to sec. 7463, and (2) the parties in a small tax case are not required to meet in order to properly prepare for trial.

[7] In general, sec. 162(a) allows a deduction for the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business.

[8] In relevant part, sec. 183 provides:

SEC. 183(a). General Rule.--In the case of an activity engaged in by an individual or an S corporation, if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section.

(b) Deductions Allowable.--In the case of an activity not engaged in for profit to which subsection (a) applies, there shall be allowed--

(continued...)

For the following reasons, we agree with respondent.

The term "trade or business" is not precisely defined in section 162 or the regulations promulgated thereunder; however, it is well established that in order for an activity to be considered a taxpayer's trade or business for purposes relevant here, the activity must be conducted "with continuity and regularity" and "the taxpayer's primary purpose for engaging in the activity must be for income or profit." Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987).

The test for whether a taxpayer conducted an activity for profit is whether he or she entered into, or continued, the activity with the actual or honest objective of making a profit. See Keanini v. Commissioner, 94 T.C. 41, 46 (1990); Dreicer v. Commissioner, 78 T.C. 642, 644-645 (1982), affd. without published opinion 702 F.2d 1205 (D.C. Cir. 1983); sec. 1.183-2(a), Income Tax Regs. The taxpayer's profit objective for each

_____

[8](...continued)

     (1) the deductions which would be allowable under this chapter for the taxable year without regard to whether or not such activity is engaged in for profit, and

     (2) a deduction equal to the amount of the deductions which would be allowable under this chapter for the taxable year only if such activity were engaged in for profit, but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1).

year in which the activity is conducted must be bona fide, taking into account all of the facts and circumstances.  See Keanini v. Commissioner, supra at 46; Dreicer v. Commissioner, supra at 645; Golanty v. Commissioner, 72 T.C. 411, 426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981); Bessenyey v. Commissioner, 45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967); sec. 1.183-2(a) and (b), Income Tax Regs.  More weight is given to objective facts than to the taxpayer's subjective statement of intent.  See Engdahl v. Commissioner, 72 T.C. 659, 666 (1979); sec. 1.183-2(a), Income Tax Regs.

The following factors, which are nonexclusive, aid in determining whether an activity is engaged in for profit: (1) The manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his or her advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) elements of personal pleasure or recreation.  See sec. 1.183-2(b), Income Tax Regs.  No one factor is determinative in and of itself, and our conclusion with respect to petitioners' profit

objective does not depend merely upon the number of factors satisfied.  See id.  As discussed above, petitioners bear the burden of proof.  See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

After careful consideration, we are not persuaded that petitioners' primary purpose for engaging in the sale and distribution of Amway products was for income or profit.  The manner in which petitioners conducted their Amway activity virtually precluded any possibility of realizing a profit.  Cf. Elliott v. Commissioner, 90 T.C. 960, 971-973 (1988), affd. without published opinion 899 F.2d 18 (9th Cir. 1990).  For example, petitioners freely incurred expenses with no realistic plan for how they might recoup those expenses.  Although petitioners maintained detailed records for certain aspects of their distributorship, the records apparently were kept merely for substantiation purposes rather than for use as tools to increase the likelihood of profit.  See Hart v. Commissioner, T.C. Memo. 1995-55; Poast v. Commissioner, T.C. Memo. 1994-399.  Furthermore, petitioners did not maintain the type of records indicating that they had, for example, analyzed and confirmed the existence of a potential market for their activity; established how long it would take to recoup losses incurred during the early years of their activity; or determined what level of sales would be necessary for their activity to become profitable.

Considering their practice of recruiting only family, friends, and acquaintances to be downline distributors, petitioners' goal of achieving a monthly point value of 4,000, which they considered to be the break-even point, strikes us as unrealistic, at best. Despite 4 years of losses, petitioners failed to change tactics to increase the likelihood of earning a profit.

Petitioners had no prior experience in business and no prior experience as Amway distributors. They accepted the advice of upline distributors who stood to benefit by petitioners' participation in an Amway distributorship but failed to solicit advice from independent business advisers. See Ogden v. Commissioner, T.C. Memo. 1999-397, affd. 244 F.3d 970 (5th Cir. 2001). When they received unsolicited advice from their accountant, they rejected it. Petitioners' restrictive method of recruiting downline distributors continued from year to year regardless of the ineffectiveness of that method.

During the years in issue, Jorge Lopez continued his full-time employment as an engineer. Consequently, petitioners' ability to maintain their financial status did not depend on the profitability of their Amway distributorship. It also appears that a substantial portion of the time petitioners spent on their Amway activity involved socializing with family and friends. See Connor-Nissley v. Commissioner, T.C. Memo. 2000-178.

Having considered all of the relevant facts and circumstances, we conclude that petitioners are not entitled to the deductions here in dispute because their Amway distributorship was not a trade or business within the meaning of section 162(a) for either year in issue. Respondent's determinations in this regard are, therefore, sustained.

To reflect the foregoing,

<u>Decision will be entered for respondent</u>.