T.C. Summary Opinion 2016-27

UNITED STATES TAX COURT

JAMES E. HESS AND ROBYN J. HESS, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 6084-14S.                     Filed June 20, 2016.

James E. Hess and Robyn J. Hess, pro se.

Steven I. Josephy, for respondent.

SUMMARY OPINION

PARIS, Judge:  This case was heard pursuant to the provisions of section

7463 of the Internal Revenue Code in effect when the petition was filed.[1]

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

Pursuant to section 7463(b), the decision to be entered is not reviewable by any other court, and this opinion shall not be treated as precedent for any other case.

In a notice of deficiency dated December 20, 2013, respondent determined a Federal income tax deficiency of $3,818 for petitioners' 2010 taxable year.

The issue for decision is whether petitioners engaged in their Amway Corp. (Amway) activity for profit. The Court holds that they did not.

## Background

Some of the facts are stipulated and are so found. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. Petitioners lived in Colorado when the petition was filed.

Petitioner James Hess received a bachelor's degree in management from the University of Phoenix and was employed as a software manager for Verizon Business Network Services, Inc. (Verizon), in 2010. Before that he had worked as a software engineer for MCI, Inc., a company that Verizon acquired in 2006. Petitioner Robyn Hess described herself as a housewife who looked after petitioners' six children.

## I. Amway in General

The issue in this case concerns petitioners' activities with regard to Amway. Amway is a supplier of household, health, and cosmetic products that are sold by

individual distributors through direct marketing. Amway distributors are able to purchase Amway products at a wholesale rate and then sell those products at normal retail prices to earn a profit.

Amway distributors can generate revenue by: (1) selling products directly to consumers; (2) earning points through Amway's reward point system; and (3) sponsoring other individuals who join Amway as distributors. In the latter case, the original distributor is called an "upline" distributor, or a sponsor, in relation to his new recruit, the "downline" distributor. The upline distributor receives points when any member of his downline sells Amway products even though he does not participate in the sale. Those points can then be redeemed for cash in the form of a bonus check. If a downline distributor engages another individual to be his downline distributor, the original upline distributor takes a percentage of the sales of both downline distributors even though he had nothing to do with the activities of the new downline distributor. Thus, to maximize Amway-related income, a distributor must sell Amway products and also try to enlist other individuals as Amway distributors.

II.     Petitioners' Amway Distributorship

Petitioners were sponsored as Amway distributors in 2005. Amway was petitioners' first independent business venture, and they did not consult with

anyone other than their sponsoring distributors before deciding to become Amway distributors. Petitioners conducted their Amway activity in their free time on evenings and weekends.

Petitioners attended Amway training functions organized by Worldwide Group, LLC (Worldwide Group). Worldwide Group is operated by several Amway distributors specifically to coordinate training and motivational seminars for other Amway distributors. Mr. Hess testified that the meetings provided petitioners with training that was necessary for them to start, and eventually grow, their Amway business. Each year petitioners attended each of Amway's quarterly meetings, and they also attended local monthly meetings.

Petitioners met with prospective distributors and showed them promotional materials in an effort to have them become members of petitioners' downline.[2] Mr. Hess testified that petitioners met with prospective downline distributors 2 to 3 times per month during 2005-2009[3] and "increased * * * [their] pace" to 5 to 7

---

[2]Petitioners refer to the process of meeting with prospective distributors, showing them promotional materials, and attempting to enlist them as members of their downline as "showing the plan".

[3]Specifically, Mr. Hess testified that they met with prospective distributors "two to three times a month" in 2005 and "about the same as we did in 2005" in 2006; that he did not know how many times per month in 2007; that they met "two to three" times per month in 2008; and that they "still maintained about the same

(continued...)

times per month during 2010, but their records indicate that they met with prospective distributors 10 times total during 2010. Mr. Hess testified that they added two to four distributors to their downline each year from 2005 to 2010.[4] Several times during his testimony Mr. Hess stated that Amway was a "people business" and that people were petitioners' greatest assets. When asked for the names of the distributors that petitioners had added to their downline, however, Mr. Hess was unable to definitively provide the Court with names or any other evidence to show who they added as members of their downline.[5]

Petitioners did not create a business plan before beginning their Amway activity or for any of the years that followed. Instead, petitioners used a document

---

[3](...continued)
pace" in 2009.

[4]Specifically, "closer to two to three" in 2005; "somewhere between two to four" in 2006; "somewhere between two to four" in 2007; "about two to four" in 2008; "two to four" in 2009; and "I'm thinking there was four" in 2010.

[5]For example, after Mr. Hess testified that petitioners "probably" added two to three downline distributors in 2005, respondent's counsel asked him who those downline distributors were, to which Mr. Hess responded: "Well, you know, I specifically don't remember those from 2005." Similarly, after Mr. Hess testified that petitioners added four downline distributors in 2010, respondent's counsel asked him who they were, to which he responded: "One of them was the--I believe it was the Baileys that year. What was that gal's name? I can't remember that gal. I can see a picture of her, but I can't remember her name * * * And then if I recall, I think that was the first time that we actually did sponsor family members. Some of our children might have actually signed up that year."

that Worldwide Group had distributed to them as their business plan for each year in which they conducted their Amway activity. The document distributed by Worldwide Group did not contain information that is generally found in a formal business plan. Rather, the document promoted a performance-bonus-generated structure whereby an upline distributor receives performance bonuses from Amway based on the volume--not profitability--of merchandise he or she sells to his or her downline distributors. The percentage increased as sales volume exceeded certain thresholds. These performance bonuses created an incentive for members of an initial upline distributor's downline to themselves become upline distributors of additional downline distributors in order to earn performance bonuses on the sales of distributors who were downline to them--thus creating a pyramid of distributors below the initial upline distributor.

Petitioners did not create a budget, an estimate of revenues or expenses, or a profit and loss statement or maintain a general ledger before beginning their Amway activity or for any of the years that followed. Instead, petitioners carefully maintained receipts to substantiate all expenses they had incurred for their Amway activity. Although petitioners maintained records of their expenses, they did not introduce any records showing how much product they sold, to whom they sold product, or the names of their alleged downline distributors.

After becoming Amway distributors in 2005, petitioners reported income and expenses from their Amway activity on Schedules C, Profit or Loss from Business. Petitioners timely filed Forms 1040, U.S. Individual Income Tax Return, for those years--each of which included a Schedule C--reporting the following income from wages, gross receipts from Amway sales, net loss from the Amway activity, and adjusted gross income (AGI):

| Year | Income from wages | Gross receipts from Amway sales | Net losses reported | Reported AGI |
|------|-------------------|----------------------------------|---------------------|--------------|
| 2005 | $96,068 | ($^2$) | $19,512 | $80,956 |
| 2006 | 90,466 | ($^2$) | 10,605 | 79,885 |
| 2007 | 97,341 | $429 | 10,958 | 90,252 |
| 2008 | 103,197 | 628 | 16,424 | 86,126 |
| 2009 | $^1$111,078 | 2,178 | 22,611 | 114,884 |
| 2010 | 108,827 | 1,545 | 23,934 | 89,678 |
| 2011 | 190,233 | 318 | 25,073 | 184,651 |

[1]This figure includes $6,146 of wage income Mrs. Hess reported.
[2]The record does not contain information for these amounts.

Petitioners purchased Amway products for personal use, but the record does not reflect whether the gross receipts they reported on Schedules C include those purchases.

Despite generating losses from their Amway activity year after year, petitioners operated the activity in the same manner regardless of the prior year's results and did not seek advice from anyone other than their sponsoring distributors.

Respondent determined that petitioners' losses from their Amway activity are limited by section 183 because petitioners did not engage in the activity for profit. Petitioners timely petitioned the Court for redetermination.

## Discussion

Generally, the Commissioner's determination of a deficiency is presumed correct, and the taxpayer bears the burden of proving it incorrect. See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Moreover, deductions are a matter of legislative grace, and the taxpayer bears the burden of proving his entitlement to any deductions claimed. INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934).

Under certain circumstances the burden of proof as to factual matters may shift to the Commissioner pursuant to section 7491(a). Petitioners claim to have met the requirements to shift the burden of proof to respondent under section 7491(a). The Court need not determine which party bears the burden of proof because this case will be decided on the preponderance of the evidence. See

Estate of Black v. Commissioner, 133 T.C. 340, 359 (2009); Knudsen v.

Commissioner, 131 T.C. 185, 189 (2008), supplementing T.C. Memo. 2007-340.

I.     Section 183 Generally

Under section 183(a), if an activity is not engaged in for profit, then no

deduction attributable to that activity is allowed except as provided for in section

183(b).  In general, section 183(b) allows deductions attributable to an activity not

engaged in for profit only to the extent of the gross income from the activity.  The

phrase "activity not engaged in for profit" means any activity other than one with

respect to which deductions are allowed for the taxable year under section 162 or

under paragraph (1) or (2) of section 212.  Sec. 183(c).  Generally, deductions are

allowable for ordinary and necessary expenses incurred in conducting a trade or

business or for the production of income.  Secs. 162(a), 212(1).

To be entitled to business expense deductions without limitation by section

183, the taxpayer must have engaged in or continued the activity with the actual

and honest objective of making a profit.  Elliott v. Commissioner, 90 T.C. 960,

969-970 (1988), aff'd without published opinion, 899 F.2d 18 (9th Cir. 1990);

Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), aff'd without published

opinion, 702 F.2d 1205 (D.C. Cir. 1983).  The taxpayer's expectation of profit

need not be a reasonable one, but merely bona fide.  See Elliott v. Commissioner,

90 T.C. at 970; Dreicer v. Commissioner, 78 T.C. at 645; sec. 1.183-2(a), Income Tax Regs. "Profit" for purposes of section 183 means economic profit, independent of tax savings. See Antonides v. Commissioner, 91 T.C. 686, 694 (1988), aff'd, 893 F.2d 656 (4th Cir. 1990); Hulter v. Commissioner, 91 T.C. 371, 393 (1988). Whether a taxpayer has an actual and honest objective of making a profit is a question of fact to be resolved by examining all of the facts and circumstances of the case. Elliott v. Commissioner, 90 T.C. at 970; Dreicer v. Commissioner, 78 T.C. at 645; sec. 1.183-2(a), Income Tax Regs.

To determine whether a taxpayer engaged in an activity for profit the Court examines the facts and circumstances of the case using the relevant factors set forth in section 1.183-2(b), Income Tax Regs. Dreicer v. Commissioner, 78 T.C. at 645; see Elliott v. Commissioner, 90 T.C. at 970. Those factors include: (1) the manner in which the taxpayer carries on the activity, (2) the expertise of the taxpayer or his advisors, (3) the time and effort expended by the taxpayer in carrying on the activity, (4) the expectation that assets used in the activity may appreciate in value, (5) the success of the taxpayer in carrying on other similar or dissimilar activities, (6) the taxpayer's history of income or losses with respect to the activity, (7) the amount of occasional profits, if any, which are earned, (8) the financial status of the taxpayer, and (9) whether elements of personal pleasure or

recreation are involved. Sec. 1.183-2(b), Income Tax Regs. These factors are not exhaustive, see id.; see also, e.g., Campbell v. Commissioner, T.C. Memo. 2011-42, 2011 WL 667973, at *5, and no one factor is determinative, Elliott v. Commissioner, 90 T.C. at 970; sec. 1.183-2(b), Income Tax Regs. Simple numerical majority will not indicate a lack of profit objective or vice versa, and the Court may accord certain factors greater weight than others. Sec. 1.183-2(b), Income Tax Regs.; see also Golanty v. Commissioner, 72 T.C. 411, 426 (1979), aff'd without published opinion, 647 F.2d 170 (9th Cir. 1981); Allen v. Commissioner 72 T.C. 28, 34 (1979). In this analysis the Court accords greater weight to proven objective facts than to mere statements of intent. Elliott v. Commissioner, 90 T.C. at 971.

Appreciation of assets has no meaningful application as a factor with respect to determining petitioners' profit motive in pursuing their Amway activity. See, e.g., Campbell v. Commissioner, 2011 WL 667973, at *5.

II.    Applicability of Section 183 to Petitioners' Amway Activity

        A.    Manner in Which Petitioners Carried On the Amway Activity

A taxpayer's carrying on an activity in a businesslike manner and maintaining complete and accurate books and records may indicate a profit objective. Sec. 1.183-2(b)(1), Income Tax Regs. If, however, there is a lack of

evidence that the taxpayer's records were used to improve the performance of a losing operation, such records generally do not indicate a profit objective. Golanty v. Commissioner, 72 T.C. at 430; Campbell v. Commissioner, 2011 WL 667973, at *5. In particular, keeping records that are used only for purposes of preparing tax returns is not indicative of a profit objective. See Campbell v. Commissioner, 2011 WL 667973, at *5.

Petitioners did not create a business plan, budget, or estimate of revenues and expenses; nor did they introduce records demonstrating the amount of product they sold, who their customers were or how many customers they had, or who their downline distributors were or how many downline distributors they had. Although petitioners carefully maintained receipts, they did not use those receipts to maintain a general ledger, create profit and loss statements, or improve the performance of their Amway activity. To the contrary, petitioners used a document that merely explained Amway's payment structure as their business plan and operated their Amway activity in the same manner each year despite consistently generating losses. On these facts, it appears that petitioners maintained receipts for substantiation purposes only rather than to monitor the income and expenses of, and ultimately improve, their Amway activity. Accordingly, the Court concludes that petitioners did not operate their Amway

activity in a businesslike manner. See Elliott v. Commissioner, 90 T.C. at 971-972 (taxpayers did not conduct their Amway activity in a businesslike manner where they did not maintain records indicating who the taxpayers' customers were, where and when they met with them, what products had been sold, and which methods had been successful); Campbell v. Commissioner, 2011 WL 667973, at *6 (taxpayers did not conduct their Amway activity in a businesslike manner in part because they maintained records primarily to substantiate tax deductions as opposed to an analytical tool for improving profitability); Theisen v. Commissioner, T.C. Memo. 1997-539 (taxpayers did not conduct their Amway activity in a businesslike manner where they did not have a business plan, conduct a break-even analysis, or create a budget).

B.    Expertise of Petitioners or Their Advisers

Preparation for the activity by extensive study of its accepted business practices, or consultation with those who are experts therein, may indicate a profit objective where the taxpayer carries on the activity in accordance with such practices. Sec. 1.183-2(b)(2), Income Tax Regs.

Amway was petitioners' first independent business venture, and they had no experience operating a direct marketing distributorship before becoming Amway distributors. Petitioners obtained advice only from their sponsoring distributors,

people who had a direct financial interest in recruiting petitioners as members of their downline.  See Campbell v. Commissioner, 2011 WL 667973, at *8 (the taxpayers' Amway upline distributors had a direct financial interest in the maximization of the taxpayers' sales volume without regard to the taxpayers' profitability); Ogden v. Commissioner, T.C. Memo. 1999-397 (the taxpayers' Amway upline distributors' advice may be biased in view of their financial interest in downline distributors' sales volume), aff'd, 244 F.3d 970 (5th Cir. 2001).  Petitioners did not seek advice from a disinterested third party at any time during which they conducted their Amway activity.  This factor weighs against petitioners.

C.    Time and Effort Expended by Petitioners in Carrying On the Activity

The fact that a taxpayer devotes much of his personal time and effort to carrying on an activity may indicate an intention to derive a profit.  Sec. 1.183-2(b)(3), Income Tax Regs.

Mr. Hess testified that petitioners spent a significant amount of their free time on nights and weekends carrying on their Amway activity, attending Amway training functions, and recruiting downline distributors.  While petitioners' records corroborate Mr. Hess' testimony that petitioners attended Amway training

functions and recruited some downline distributors, their records conflict with his testimony that petitioners met with prospective downline distributors five to seven times per month in 2010. Instead, their records indicate that they met with prospective downline distributors 10 times total during 2010. This factor is neutral.

D.    Petitioners' Success in Carrying Out Other Similar or Dissimilar Activities

The fact that the taxpayer has engaged in similar activities in the past and converted them from unprofitable to profitable enterprises may indicate that he is engaged in the present activity for profit, even though the activity is presently unprofitable. Sec. 1.183-2(b)(5), Income Tax Regs.

Amway was petitioners' first independent business venture. Petitioners had five years of Amway experience before the year in issue but were unable to translate their experience into improvement, generating only $1,545 of gross receipts and reporting another net loss in 2010. Further, petitioners did not provide the Court with names or records of the distributors they allegedly enlisted as members of their downline. This factor weighs against petitioners. See Elliott v. Commissioner, 90 T.C. at 972 (in holding that the taxpayers' Amway activity was not engaged in for profit, the Court noted that they had two years of Amway

experience before the year in issue but "learned little from their two years of experience" because they generated income of only $562 and had enlisted only one downline distributor).

E.    Petitioners' History of Income or Loss

Although no one factor is determinative of the taxpayer's intention to make a profit, a record of substantial losses over many years and the unlikelihood of achieving a profitable operation are important factors bearing on the taxpayer's true intention. Golanty v. Commissioner, 72 T.C. at 426. A series of losses during the initial or startup stage of an activity may not necessarily be an indication that the activity is not engaged in for profit. Sec. 1.183-2(b)(6), Income Tax Regs.; see Golanty v. Commissioner, 72 T.C. at 427; Campbell v. Commissioner, 2011 WL 667973, at *9. Where a taxpayer continues to sustain losses beyond the period which customarily is necessary to bring the operation to profitable status, however, such continued losses, if not explainable, may indicate that the activity is not engaged in for profit. Sec. 1.183-2(b)(6), Income Tax Regs.; see Campbell v. Commissioner, 2011 WL 667973, at *9. The "goal must be to realize a profit on the entire operation, which presupposes not only future net earnings but also sufficient net earnings to recoup the losses which have meanwhile been sustained in the intervening years." Bessenyey v. Commissioner, 45 T.C. 261, 274 (1965),

aff'd, 379 F.2d 252 (2d Cir. 1967); see Golanty v. Commissioner, 72 T.C. at 427; Campbell v. Commissioner, 2011 WL 667973, at *9.

Petitioners' gross income from the sale of Amway products never exceeded their expenses. Petitioners reported a net loss in each year from 2005 to 2011. Further, after the first two years of experience petitioners generated gross receipts of only $5,098 from 2007 to 2011 and reported a total net loss of $99,000 during the same period. During the year at issue, petitioners generated only $1,545 of gross receipts and reported a $23,934 net loss, despite having five years of experience. Petitioners' lack of gross receipts, while reporting increasingly larger losses for each year from 2006 to 2011, indicates a lack of profit objective, especially when considering that petitioners did not change the way in which they conducted their Amway activity. See Elliott v. Commissioner, 90 T.C. at 972 (the taxpayers did not engage in their Amway activity for profit where they generated income of only $562 despite having two years of prior experience); Campbell v. Commissioner, 2011 WL 667973, at *9 (the taxpayers did not engage in their Amway activity for profit despite seeing an $80,000 increase in gross receipts over a three-year period where their Amway activity always generated annual losses exceeding $20,000). This factor weighs against petitioners.

F.     The Amount of Occasional Profits, If Any, Which Are Earned

This factor concerns the amount of profits in relation to the losses incurred, investments made in the activity, and the value of the assets used in the activity. Sec. 1.183-2(b)(7), Income Tax Regs.

As discussed supra, petitioners generated total gross receipts of only $5,098 from 2007 to 2011 and reported a total net loss of $99,000 during the same period. "The magnitude of the activity's losses in comparison with its revenues is an indication that * * * [the taxpayer] did not have a profit motive with respect to the activity." Miller v. Commissioner, T.C. Memo. 1998-463, 1998 WL 906689, at *6 (citing Smith v. Commissioner, T.C. Memo. 1997-503, aff'd, 182 F.3d 927 (9th Cir. 1999), and Burger v. Commissioner, T.C. Memo. 1985-523, aff'd, 809 F.2d 355 (7th Cir. 1987)).  This factor weighs against petitioners.

G.     Petitioners' Financial Status

Substantial income from sources other than the activity (particularly if the losses from the activity generate substantial tax benefits) may indicate that the activity was not engaged in for profit.  Sec. 1.183-2(b)(8), Income Tax Regs.

Mr. Hess was employed full time by MCI, Inc., and Verizon between 2005 and 2010.  Petitioners also conducted their Amway activity during that period.

Mr. Hess offset the wages that he reported during those years by reporting Amway net losses as follows:

| Year | Wages | Amway net loss | Reported AGI |
|------|-------|----------------|--------------|
| 2005 | $96,068 | $19,512 | $80,956 |
| 2006 | 90,466 | 10,605 | 79,885 |
| 2007 | 97,341 | 10,958 | 90,252 |
| 2008 | 103,197 | 16,424 | 86,126 |
| 2009 | [1]111,078 | 22,611 | [2]114,884 |
| 2010 | 108,827 | 23,934 | 89,678 |

[1]This figure includes $6,146 of wage income Mrs. Hess reported.
[2]For 2009 petitioners reported "other income" of $22,964.

By deducting the net losses associated with their Amway activity, petitioners substantially reduced the tax liability they would otherwise have owed. This indicates a lack of profit objective. See Ransom v. Commissioner, T.C. Memo. 1990-381. This factor weighs against petitioners.

H.      Elements of Personal Pleasure or Recreation

The presence of personal motives in carrying on an activity may indicate that the activity is not engaged in for profit, especially where recreational or personal elements are involved. Sec. 1.183-2(b)(9), Income Tax Regs.

The Court has previously observed that "there are significant elements of personal pleasure attached to the activities of an Amway distributorship" and that "an Amway distributorship presents taxpayers with opportunities to generate business deductions for essentially personal expenditures." Brennan v. Commissioner, T.C. Memo. 1997-60, 1997 WL 39496, at *3; see also Campbell v. Commissioner, 2011 WL 667973, at *10. In many of the Amway cases in which the Court has found elements of personal pleasure attached to Amway activities, taxpayers have deducted personal expenditures as Amway-related expenses, see, e.g., Campbell v. Commissioner, 2011 WL 667973, at *10-*11, or deducted costs associated with maintaining an active social life as Amway-related expenses, see, e.g., Elliott v. Commissioner, 90 T.C. at 973. The Court cannot definitively say that petitioners deducted personal expenditures as Amway-related expenses or used Amway to maintain an active social life while generating tax deductions. The record does not tip the scale in favor of either respondent or petitioners with respect to this factor. Accordingly, this factor is neutral.

I.    Conclusion

Although petitioners maintain that they engaged in and continued their Amway activity with the actual and honest objective of making a profit, the objective facts indicate otherwise. Petitioners did not conduct their Amway

activity in a businesslike manner, did not seek advice from disinterested third parties, did not maintain records for the purpose of monitoring and improving business performance, and have consistently produced losses while generating nominal gross receipts. On this record, the Court concludes that petitioners did not engage in their Amway activity with the requisite objective of making a profit. Consequently, their deductions arising from the Amway activity are limited by section 183.

The Court has considered all of the arguments made by the parties, and to the extent they are not addressed herein, they are considered unnecessary, moot, irrelevant, or without merit.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for respondent</u>.