T.C. Memo. 2007-177

UNITED STATES TAX COURT

MICHAEL J. ROZZANO, JR. AND ROSE MARIE ROZZANO, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 12344-03.                    Filed July 3, 2007.

<u>Paul A. Nidich</u>, for petitioners.

<u>Terry Serena</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GOLDBERG, <u>Special Trial Judge</u>:  Respondent determined
deficiencies in petitioners' Federal income tax of $25,108 for
taxable year 1999 and $19,610.07 for taxable year 2000.  Unless
otherwise indicated, all section references are to the Internal

Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

The issue for decision is whether petitioners' ongoing horse-boarding activity was a bona fide business activity within the meaning of section 183 during the taxable years in issue.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. Petitioners resided in Loveland, Ohio, on the date the petition was filed in this case.

History of Petitioners' Horse-Boarding Activity

Petitioners purchased a tract of land in Clermont County, Ohio, in May 1989 for $450,000. At the time of purchase, the property contained one barn, one indoor horse arena, pastures, and a residence. Petitioners purchased the property to provide their family, including their two adult children, with ample land and a home where they all could live and enjoy their shared love of horses. At the time of the purchase, petitioners' adult daughter was involved in the horse industry in Memphis, Tennessee. Shortly after acquiring the property, petitioners purchased at least one horse, and petitioner wife (Mrs. Rozzano) engaged in a remodeling of the residence. Petitioners maintained the property as their primary residence between 1989 and 1992.

In 1992, petitioner husband (Mr. Rozzano) was hired to be the president of Armour Swift Eckridge, Inc., a publicly held corporation.  Mr. Rozzano's new position required that he relocate to Chicago, Illinois, which was approximately 5 hours from their residence.  At this time, petitioners decided that instead of selling the property, which they had dubbed "Sugar Tree Farm" (Sugar Tree), they would try to operate a horse-boarding business.

Between 1992 and 2002, Mr. Rozzano changed jobs at least twice, as he was hired in 1999 to be the executive vice president and sales manager for Thorn Apple Valley, Inc., and in 2000, he was hired to be the senior vice president and general manager of Plumrose, U.S.A.  During 1999, petitioners resided approximately 5 hours away from Sugar Tree in West Bloomfield, Michigan, while Mr. Rozzano worked at Thorn Apple Valley, Inc.

After relocating to Chicago in 1992, petitioners began their horse-boarding activity.  This activity made use of the 27 stalls housed in the barn at Sugar Tree, an indoor arena, and the adjacent fields.  Because petitioners resided more than 350 miles from Sugar Tree, they employed at least one person to look after the property and run the day-to-day operations taking place there.

Between 1993 and 2003, when Sugar Tree was sold, petitioners rented a great number of the 27 available stalls for horse-

boarding.  Typically, between 40 percent and 65 percent of the stalls were rented at any given time.  During the taxable years in issue, petitioners charged in the range of $375 per month for each horse boarded at Sugar Tree.  In addition to the boarded horses, petitioners kept their own horse and pony in the stables. However, the last time that petitioners rode either horse was in 1990.

Mr. Rozzano applied his extensive business knowledge and experience to the activity at Sugar Tree.  Using various computer software programs, he compiled spreadsheets and projected budgets for the activity.  He also performed most of the major upkeep on Sugar Tree, including mowing the fields, mending horse fences, mucking stalls, and also feeding horses on those days that he was present at Sugar Tree.  According to Mr. Rozzano, during the time that petitioners lived away from Sugar Tree (which was approximately 80 percent of the time of 1999 and some small part of 2000), he would wake up each Saturday morning, drive approximately 5-plus hours from West Bloomfield, Michigan, to Sugar Tree (Loveland, Ohio), spend 6 to 8 hours each day of the weekend mowing, mucking, and mending, and then get back in his car late Sunday afternoon and drive 5 hours back to West Bloomfield.  Mr. Rozzano testified that he made this trip every weekend and holiday until they temporarily moved back to reside full time at Sugar Tree sometime in 2000.

Between 1993 and 2000, petitioners reported the following amounts of income and expenses from their activities at Sugar Tree on their Schedules C, Profit or Loss From Business:

|                   | 1993      | 1994      | 1995      | 1996      |
|-------------------|-----------|-----------|-----------|-----------|
| Gross receipts    | $61,728   | $56,352   | $47,952   | $92,267   |
| Expenses          | 116,972   | 116,859   | 104,580   | 128,580   |
| Net profit/(loss) | (55,244)  | (60,507)  | (56,628)  | (36,313)  |

|                   | 1997      | 1998      | 1999      | 2000      |
|-------------------|-----------|-----------|-----------|-----------|
| Gross receipts    | $65,826   | $92,267   | $53,204   | $58,109   |
| Expenses          | 134,491   | 161,047   | 147,894   | 149,834   |
| Net profit/(loss) | (68,665)  | (68,780)  | (94,690)  | (91,725)  |

During the taxable years in issue, petitioners reported income on their Federal income tax returns as follows:

|                       | 1999          | 2000          |
|-----------------------|---------------|---------------|
| Wages, salaries, tips | $221,968.18   | $159,018.45   |
| Taxable interest      | 690.94        | 1,749.32      |
| Tax-exempt interest   | 36.57         | 85.22         |
| Ordinary dividends    | 984.96        | 1,067.51      |
| Taxable refunds       | 437.00        | 2,490.00      |
| Business income or loss | (94,690.06) | (91,722.66)   |
| Capital gain or loss  | (3,000.00)    | (2,817.05)    |
| Pensions and annuities | ROLLOVER     | ROLLOVER      |
| Total                 | $126,427.59   | $69,870.79    |

During the taxable years in issue, petitioners claimed the following business expenses[1] on their Schedules C:

|                       | 1999   | 2000   |
|-----------------------|--------|--------|
| Advertising           | $105   | $0     |
| Car and truck expenses | 3,906 | 0      |
| Insurance             | 1,865  | 2,859  |
| Interest              | 2,634  | 5,368  |
| Office expenses       | 2,787  | 1,230  |

---

[1] These figures have been rounded to the nearest dollar.

| | | |
|---|---:|---:|
| Repairs and maintenance | 4,430 | 7,791 |
| Supplies | 3,106 | 2,302 |
| Taxes and licenses | 58 | 58 |
| Travel | 10,361 | 7,307 |
| Meals | 2,337 | 1,874 |
| Utilities | 13,249 | 11,618 |
| Wages | 19,925 | 19,836 |
| Other expenses: | | |
|  Veterinarian | $13,981 | $19,773 |
|  Groundskeeping | 6,167 | 3,777 |
|  Farrier | 2,010 | 1,990 |
|  Hay and feed | 38,666 | 40,806 |
|  Bedding | 4,303 | 5,242 |
|  Total | 65,127 | 71,588 |
| Cash expenses before depreciation | 129,890 | 131,831 |
| Depreciation | 18,003 | 18,003 |
| Total expenses | 147,893 | 149,834 |

Substantiation of these figures is not in dispute.

During 1999 and 2000 petitioners received the following monthly income from the number of horses boarded as shown below:

| 1999 | | | 2000 | | |
|---|---|---|---|---|---|
| Month | Income | Horses | Month | Income | Horses |
| January | $3,886.65 | 12 | January | $6,596.00 | 18 |
| February | 4,031.50 | 11 | February | 5,650.00 | 15 |
| March | 4,427.42 | 11 | March | 4,870.00 | 13 |
| April | 3,375.00 | 9 | April | 5,025.00 | 14 |
| May | 2,940.00 | 9 | May | 4,447.30 | 14 |
| June | 4,050.03 | 10 | June[2] | -------- | -- |
| July | 4,476.00 | 12 | July | 5,504.00 | 15 |
| August | 4,105.00 | 11 | August | 4,275.00 | 12 |
| September | 4,105.00 | 11 | September | 4,575.00 | 13 |
| October | 6,156.60 | 16 | October | 4,437.00 | 13 |
| November | 5,585.00 | 16 | November | 4,628.00 | 13 |
| December | 5,383.00 | 15 | December | 3,260.00 | 9 |

---

[2] Figures for June 2000 were not included in the record.

After sustaining yearly losses in the early years of operations, petitioners were somewhat, but not overly, concerned with the losses incurred because they thought that they could "get a handle on the expenses and get them under control." But as time went on, it became evident to petitioners that there were too many contingencies that were beyond their control which caused their losses to be greater than they ever expected. Petitioners attempted to forecast a profit, or at least a break-even point by utilizing both detailed operating statements and projected budgets which modified their business plan. However, they were unable to reach a break-even point, even after following their carefully modified business plan.

Factors contributing to their inability to keep to plan included a variance in hay costs fluctuating upon the number of horses, and unpredictable conditions whereby petitioners were unable to grow an adequate amount of hay on their pastures. This resulted in the purchase of additional hay. Moreover, a leaky roof in one of the years at issue resulted in a loss of a large portion of their hay reserves.

Petitioners provided full care and all of the services required of the horses boarded at Sugar Tree. In particular, the indoor arena provided a benefit to their boarders in the winter, as the horses could be ridden indoors.

In 1999, petitioners arrived at the conclusion that their horse-boarding activity would never be profitable irrespective of their years of detailed business analyses and budget projections. Sometime in 2000, petitioners decided to sell Sugar Tree as an ongoing business. By doing so, petitioners had to maintain the property and the boarding activity to show it to prospective buyers as an ongoing business. Petitioners began to share their intent to sell with colleagues in the horse-boarding and breeding business in the area. After listing the property in 2001 for $1,495,000, and placing advertisements in at least one national horse breeding periodical, petitioners sold the farm in 2003 for $1,275,000.

Respondent mailed to petitioners on May 2, 2003, a notice of deficiency for taxable years 1999 and 2000. At the time of the filing of the petition, and pursuant to Rule 171, petitioners requested that the case be conducted as a small tax case. Before the trial, however, petitioners' attorney requested, pursuant to Rule 171(c), an order directing that the small case designation be removed. Respondent raised no objection to petitioners' request, and filed an answer on March 28, 2006, the trial date. Respondent also requested in his answer that the deficiencies for taxable years 1999 and 2000 be increased to $42,215 and $35,028.05, respectively. The increased deficiencies are a result of respondent's misapplication of the provisions of

section 183 to the excess of loss reported minus income.  In the
notice of deficiency, respondent computed the deficiencies by
recatagorizing the excess losses as deductible unreimbursed
business expenses on petitioners' Schedules A, Itemized
Deductions.

OPINION

In this case, we are asked to decide whether petitioners'
continuing horse-boarding activity was a bona fide business
activity within the meaning of section 183 near the end of its
operation.  In order to arrive at a decision, our inquiry cannot
separate the taxable years before us from the earlier years of
petitioners' business operations.  Accordingly, we must consider
not only petitioners' horse-boarding activities in these taxable
years but also their activities in prior years to construct an
accurate picture of petitioners' total business activity.

Horse-Boarding Activity

The parties disagree as to whether petitioners engaged in
their Schedule C activity with an objective of making a profit
within the meaning of section 183 during the taxable years in
issue.[3]  In addition, petitioners disagree with respondent's

_____

[3] When the case was called for trial, the parties offered
into evidence Exhibit 14-J, a document showing that respondent
conducted an examination of petitioners' 1996 Federal income tax
return and the results of the audit.  Respondent objected on the
grounds of a lack of foundation, hearsay, and that petitioners
sought to introduce this evidence for estoppel.  The Court
(continued...)

request for an increase in the deficiencies in the event that we sustain respondent in this matter.

Section 183(a) disallows deductions attributable to an activity not engaged in for profit. Section 183(b) provides two exceptions to this general rule. The first, provided by section 183(b)(1), permits deductions that otherwise would be allowable without regard to whether the activity is engaged in for profit; the second, provided by section 183(b)(2), permits deductions that would be allowable only if the activity were engaged in for profit to the extent that the gross income from the activity exceeds the deductions allowable pursuant to section 183(b)(1). Section 183(c) defines an "activity not engaged in for profit" as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212." In general, the Commissioner's determination set forth in the notice of deficiency is presumed correct. Rule 142(a)(1); Welch v. Helvering, 290 U.S. 111, 115 (1933). In certain circumstances

---

[3](...continued)
overruled respondent's objection and admitted Exhibit 14-J into evidence together with the stipulation. The Court instructed respondent that it would not bar him from maintaining a different position with respect to the taxable years at issue in the present case. The Court informed the parties that it would weigh this piece of evidence in the light of the entire record in the case. We recognize the implication of this documentation is that respondent allowed depreciation on assets held for use in petitioners' horse-boarding activities in taxable year 1996.

the burden of proof shifts to respondent.  Sec. 7491(a)(1); Rule 142(a).  Because the issue in this case is a legal one, we reach our decision without regard to the burden of proof.  However, petitioners contend that section 7491(a) and Rule 142(a) are applicable with respect to the increases in the deficiencies pleaded in respondent's answer.  They are correct on this point.

In deciding whether petitioners' horse-boarding activity was engaged in for profit during the taxable years at issue, we must inquire whether petitioners had an actual and honest objective of making a profit from the activity.  Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983).  The taxpayers' expectation need not be a reasonable one.  Id. at 644-645; Golanty v. Commissioner, 72 T.C. 411, 425 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981); sec. 1.183-2(a), Income Tax Regs.  Whether there is present an actual and honest objective of making a profit is a question of fact that is to be resolved upon a consideration of all relevant circumstances, with the greatest weight being given to the objective factors rather than the taxpayers' expression of their intent.  Dreicer v. Commissioner, supra at 645; Golanty v. Commissioner, supra at 426; sec. 1.183-2(a) and (b), Income Tax Regs.

Section 1.183-2(b), Income Tax Regs., lists these relevant factors that we now consider:  (1) The manner in which the

taxpayers carry on the activity; (2) the expertise of the taxpayers or their advisers; (3) the time and effort expended by the taxpayers in carrying on the activity; (4) the expectation that the assets used in the activity may appreciate in value; (5) the success of the taxpayers in carrying on similar or dissimilar activities; (6) the taxpayers' history of income or loss with respect to the activity; (7) the amount of occasional profits; (8) the financial status of the taxpayers; and (9) whether elements of pleasure or recreation are involved. Golanty v. Commissioner, supra at 426; sec. 1.183-2(b), Income Tax Regs.

Based on our consideration of these factors and in the light of the detailed record in this case, we conclude that petitioners' horse-boarding activity was carried on as a business within the meaning of sections 162 and 183 during the taxable years at issue. In reaching this conclusion, we view the following facts and circumstances as most persuasive:

Manner in Which Taxpayers Carried On the Activity

Respondent contends that the manner in which petitioners conducted their horse-boarding activity does not indicate that the activity was engaged in for profit during the years in issue. The relevant inquiries before us include whether petitioners conducted their business in a manner similar to other comparable businesses, whether petitioners maintained complete and accurate books and records, and whether changes were attempted to improve

profitability.  See Engdahl v. Commissioner, 72 T.C. 659, 667-668 (1979); sec. 1.183-2(b)(1), Income Tax Regs.

As to their manner of conduct, during the taxable years in issue, petitioners, for the most part, rented more than one-half of the available stalls in their barn.  Petitioners provided detailed monthly boarding records for 1999 and 2000, which list each horse and the expenses incurred.  From the inception of their activities in 1992, through the years in issue, petitioners also maintained extensive and separate accountings for all of their horse-boarding income and expenses using a software program tailored to small farm operators.  Based on these facts, we are satisfied that petitioners' maintenance of complete and accurate records in this case supports a profit objective.  See Elliott v. Commissioner, 90 T.C. 960, 971-972 (1988), affd. without published opinion 899 F.2d 18 (9th Cir. 1990); sec. 1.183-2(b), Income Tax Regs.

As to petitioners' other business practices, although petitioners made no great effort to advertise their boarding service to the general public, we do not find their lack of advertising indicative of an absence of profit motive, as their word-of-mouth approach in attracting clientele was clearly successful, as they had, at one point during the years in issue, 80 percent of their stalls rented.

Notably, however, despite the significant stall rental statistics and petitioners' thorough accounting methods, we cannot overlook Mr. Rozzano's refreshingly candid testimony at trial that he came to realize sometime in 1999 that petitioners would neither earn a profit nor reach a break-even point if they held to their existing boarding fees, nor could they raise boarding fees or hire additional help in order to become profitable. Mr. Rozzano reached this conclusion after he analyzed all factors necessary to attempt to make the business more profitable.

In fact, after his analysis, he calculated that these measures (i.e., raising boarding fees and hiring additional help) would likely increase his operating costs taking into account the scope of the services provided to the boarders. Moreover, it was likely that the terms of the contracts then existing with the boarders meant that any modification to the monthly rental agreements would have placed petitioners in breach of contract. Mr. Rozzzano then did what any prudent business person would do, attempt to lessen expenses until the business including the property could be sold.

Petitioners' rental fees remained unchanged after Mr. Rozzano decided to sell Sugar Tree (a decision made sometime in 2000). Notably, petitioners still kept meticulous business records and used word-of-mouth to advertise their boarding

services during the years in which they were continuing the boarding activities while, at the same time, preparing the property for sale.

Mr. Rozzano also testified that it was primarily the cost associated with hay feed that caused their business to experience ongoing losses. We note that for 1999 and 2000, hay and feed expenses accounted for 34 percent and 32 percent, respectively, of all cash expenses before depreciation. To this end, petitioners devised a strategy to ensure that their hay supply costs could be mitigated so as to reduce losses and accord with their budget projections. Petitioners took steps to ensure that the hay would remain dry and free from infestation and that their helper would not waste it unnecessarily. Petitioners also took steps in 1999 and 2000 to reduce other operating expenses, such as travel, meals, and utilities. These costs did, in fact, decrease from 1999 to 2000. Although petitioners did make efforts to reduce their hay expenses by protecting their supply, an increase in the number of boarders in 2000, coupled with an increase in the wholesale price of the feed, resulted in an increase in hay costs. While we recognize that efforts to improve profitability can be indicative of whether petitioners intended to realize a profit, we do not find their refusal to raise stall rental prices or hire additional help, especially in the light of their existing contracts, of their decision to sell

Sugar Tree, and of their efforts to reduce hay and other costs, dispositive on the issue of their profit motive.  It is beyond this Court's purview to second-guess petitioners' business judgment or the manner of operations of their business.  We decline to do so.

In this case, we are presented with taxpayers who admit that during 1999, they became aware that they could not make a profit but yet still continued business operations while taking steps to mitigate their expenses until the business and property could be sold.  Accordingly, we now address whether petitioners' admission at trial should trump the other facts and circumstances of this case.

While we cannot disregard Mr. Rozzano's admission that at some point in 1999 he realized that his hopes of turning the boarding activities into a profitable business were unattainable we do not find that as of that moment, petitioners' activities ceased to be a bona fide business within the meaning of section 183.  Moreover, our decision comports with this Court's holding in Dreicer, where greater weight must be afforded to the consideration of all of the facts and circumstances.  In this case, the facts and circumstances surrounding petitioners' actions between the time of their realization with respect to profitability in 1999 and the ultimate disposal of the property

in 2003 show that they continued to conduct their horse-boarding activities in a businesslike manner.

Even after petitioners' realization with respect to the profitability of their horse-boarding activities, their actions illustrate steps taken to mitigate costs and to try to achieve at least a break-even point until the business could be sold. First, petitioners held contracts for stall rentals which they did not change, nor could they change, for fear of being in breach. Second, petitioners made active attempts to reduce hay and feed costs. Third, petitioners continued to rent stalls, maintain their ongoing operations, and even moved back to the property on a full-time basis in 2000. Finally, and perhaps most significantly, the amount of operating costs borne by petitioners comprised a large share of their wage income in the years at issue. Petitioners had wages of $221,968 in 1999, and $159,018 in 2000, and reported net out-of-pocket expenses in those years from Sugar Tree of $76,687 and $73,722,[4] respectfully. These net out-of-pocket expenditures were 34 percent and 46 percent of petitioners' wages in 1999 and 2000, respectfully. We cannot conclude, based on the entirety of the foregoing, that their activities turned from business into hobby overnight in 1999 based upon Mr. Rozzano's admission at trial.

---

[4] For 1999, gross income of $53,204, less cash expenses before depreciation of $129,891. For 2000, gross income of $58,109, less cost of expenses before depreciation of $131,831.

Expertise of and Effort Expended by the Taxpayers

Respondent does not challenge either petitioners' expertise or the time and effort expended on the activity at issue.  We believe that petitioners have established, through credible testimony, that they not only were well possessed of the knowledge necessary to operate a horse-boarding business, but that Mr. Rozzano contributed vast amounts of time to the operations at Sugar Tree.  First, petitioners were well aware from their experience as horse owners of the requirements for boarding horses before they commenced activity at Sugar Tree.  Second, horse-boarding, unlike other horse-related endeavors, such as breeding and training, while it entails risk, to be sure, is rather simple in its day-to-day execution; horses are taken out to pasture ("turned out"), fed, returned to stables to rest, taken out again, fed again, and retired to their stables.  There is nothing in the record that suggests that petitioners were not well versed and extremely competent in these practices.

Finally, although we suspect that Mr. Rozzano's testimony that he spent every weekend and holiday for 10 years performing upkeep at Sugar Tree may be an overstatement, we find him a credible and forthright witness overall and moreover, we believe that he performed most, if not all, of the major upkeep projects on Sugar Tree himself.  Therefore, we believe that the expertise

of and time and effort expended by petitioners support a finding that the activity was engaged in for profit.

Expectation That Assets Would Appreciate

Petitioners argue that the increase in the value of Sugar Tree and the efforts they expended and expenses they incurred in upkeep of the property support a conclusion that the horse-boarding activity was engaged in for profit. We disagree. On the issue of whether appreciation of land supports petitioners' profit intent, the relevant inquiry is whether the holding of the land for appreciation and the conducting of the horse-boarding constitute a single activity or separate activities. Sec. 1.183-1(d)(1), Income Tax Regs. Determining whether the two undertakings are a single activity requires the examination of all of the facts of the case; the most significant facts being those that show the degree of organizational and economic interrelationship of the undertakings. Id.

In this case, petitioners primarily purchased the land for personal enjoyment and not to engage in a business. Therefore, they had no bona fide intention, at the time of purchase, to realize a profit that could offset later operating losses as they had not yet contemplated any business using the property. Only subsequent to the purchase did petitioners use the property in their horse-boarding activities.

Moreover, we note that the variable costs of petitioners' horse-boarding activities, including fees, veterinarian care, etc., exceeded the gross income produced by the activities, with the result that the horse-boarding activities do not meet the test imposed under the regulation pertaining whether such activities will be integrated. See sec. 1.183-1(d)(1), Income Tax Regs. Accordingly, we believe, in this case, that their holding the property for appreciation and horse-boarding are separate activities. See sec. 1.183-2(b)(4), Income Tax Regs.; Engdahl v. Commissioner, 72 T.C. 659 (1979); Allen v. Commissioner, 72 T.C. 28 (1979). Irrespective of this conclusion, however, we do not believe that petitioners' inability to argue the appreciation of their land is ultimately determinate on the issue of whether the horse-boarding activity was engaged in for profit.

Financial Status of the Taxpayers

The fact that petitioners have substantial income from sources other than the activity at issue may indicate that the activity was not engaged in for profit. Cf. Engdahl v. Commissioner, 659, 670. Respondent argues that Mr. Rozzano's income from his job in executive management was sufficient to absorb the expenses in operating Sugar Tree, indicating that it was not operated for profit. We disagree. As previously stated, these out-of-pocket expenditures were 34 percent and 46 percent

of petitioners' wages in 1999 and 2000, respectively. We are not persuaded that petitioners were able to absorb easily the losses attributable to the activity at Sugar Tree during these years. As previously stated, the income reported by petitioners on their tax returns for the years in controversy does not, in our opinion, demonstrate that the losses incurred by petitioners were offset either by petitioners' income in those years or excessive depreciation deductions claimed by them.

Moreover, whatever income petitioners may have had during the years in issue is secondary to the primary inquiry as to whether or not petitioners engaged in the activity with a genuine intent to profit from it. We note that petitioners had no other income in the years at issue apart from Mr. Rozzano's work and a 3-week, holiday job taken by Mrs. Rozzano at The Gap, Inc. By 1999, both of petitioners' adult children had left the familial home, and so, the physical work and personal efforts expended by petitioners were not being done for the immediate benefit of their children. We believe it unlikely, given the distance petitioners regularly traveled to and from Sugar Tree, the liability risk inherent to their activity, and the nature and extent of the physical labor which they performed while at Sugar Tree, that petitioners would maintain a hobby costing thousands of dollars and entailing much physical labor.

## Elements of Pleasure/Recreation

Respondent argues that not only are Mr. Rozzano's claims regarding his involvement with the work done at Sugar Tree improbable, but that regardless of the amount of effort petitioners put into the activity, elements of pleasure should trump any consideration that the activity was a business.  We disagree.  Until sometime in 2000, petitioners resided at least 5 hours away from Sugar Tree.  This distance required petitioners to travel between their home and Sugar Tree on weekends and holidays.  We believe, based on their credible testimony at trial, that once at Sugar Tree, petitioners did perform a significant amount, if not all, of the major upkeep on the property.  Furthermore, petitioners did not ride either of their horses for pleasure after 1990.  We do not find that the pleasure that petitioners may have experienced through their ownership of Sugar Tree should trump a finding that the horse-boarding activity was operated for profit.  See Jackson v. Commissioner, 59 T.C. 312, 317 (1972).

Possibly the only elements of pleasure taken by petitioners were either when watching their own horses frolic in the pasture or in the mere fact that they could attest to "owning a horse farm near Lexington, Kentucky."

Therefore, on the basis of all of the evidence in the record of this case, the circumstances of which are unique, we conclude

and hold that petitioners conducted their horse-boarding activity in the years in issue as a bona fide business within the meaning of section 183.

Accordingly,

Decision will be entered for petitioners.